# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 22, 2000 Session

## STATE OF TENNESSEE v. JOHN D. BROWN

**Appeal from the Criminal Court for McMinn County**
**No. 95-095     R. Steven Bebb, Judge**

---

**No. E1999-02217-CCA-R3-CD**
**December 18, 2000**

---

The Defendant, John D. Brown, appeals as of right from his McMinn County convictions for first degree murder and abuse of a corpse.  On appeal, he raises nine issues:  (1) whether the trial court failed to properly function as the thirteenth juror in considering the Defendant's motion for judgment of acquittal and a new trial; (2) whether the Honorable Steven Bebb erred by failing to recuse himself upon the grounds that under Tennessee Code Annotated section 17-1-305, only the Honorable Carroll Ross, the successor in office to the late Judge Mayo L. Mashburn, could rule on the Defendant's motion for a new trial; (3) whether the evidence was sufficient to support the verdict and whether the evidence was sufficient to establish that the offense was committed prior to the return of the formal charge; (4) whether the trial court erred by failing to grant the Defendant's special jury instruction request; (5) whether the trial court erred by not allowing into evidence the testimony of Frank Hammonds, Polk County General Sessions Judge; (6) whether the trial court erred by not allowing into evidence the medical records pertaining to the treatment of Danny Jones at the Athens Regional Medical Center; (7) whether the trial court erred by failing to grant a mistrial after T.J. Jordan, a witness for the State, volunteered information to the jury that a certain four-wheel land vehicle found on the Defendant's property was "stolen"; (8) whether the trial court erred by overruling the Defendant's motion to dismiss criminal charges for violating the "anti-shuttling provisions" of the Interstate Agreement on Detainers Act; and (9) whether the trial court erred by ordering the Defendant's sentence for murder to run consecutive to his life sentence in the federal penitentiary.  We hold that the Defendant's convictions must be reversed and the case remanded for a new trial because the trial judge failed to properly function as the thirteenth juror and because the State failed to prove beyond a reasonable doubt that the offenses were committed prior to the return of the formal charge.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

DAVID H. WELLES, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined.  JOSEPH M. TIPTON, J., filed a opinion concurring in part and dissenting in part.

S. Randolph Ayres, Athens, Tennessee, for the appellant, John D. Brown.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kusmann, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Barry A. Steelman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The proof at trial established that the Defendant, John "Wolf" Brown, and the victim, Billy Ray Crumley, had a rocky relationship. The two met in October 1993 when the Defendant was attempting to purchase some methamphetamine. The Defendant also met Debbie Bryan, who was dating the victim. The Defendant and his wife, Elaina Conn Brown, socialized with Billy Crumley and Debbie Bryan until both couples separated in April 1994. In May 1994, the Defendant started dating Debbie Bryan. Billy Crumley and Elaina Brown started seeing each other as well, but Elaina denied that their relationship was romantic.

After the Defendant and Debbie Bryan started dating, Billy Crumley became very jealous. He repeatedly told others that he was in love with Debbie and that he planned to kill the Defendant. The Defendant also stated that he was going to kill Crumley if Crumley did not leave him alone. Nevertheless, the Defendant would allow Crumley to visit his residence, known as "Booger Hill," to purchase and use methamphetamine. The Defendant and Crumley continued to use methamphetamine together. The Defendant regularly sold methamphetamine at "Booger Hill."[1]

There was a plethora of evidence offered regarding the animosity between the Defendant and Billy Crumley and regarding Crumley's violent tendencies. On June 24, 1994, Crumley and Elaina Brown went to the Defendant's residence to retrieve some of Elaina's belongings, incorrectly believing that the Defendant was not there. According to the Defendant, Debbie and Elaina started fighting because Elaina called Debbie's daughter a name. The fight escalated and Crumley started hitting the Defendant, at which point the Defendant yelled at Vicky Brown, his brother's ex-wife, to go get a gun. Vicky went into the house and brought back a gun, which she gave to the Defendant. The Defendant pointed the gun at Crumley and told him to leave and not come back. The Defendant said that Crumley called him later that day and said, "I'll be up there sometime and get you when you're least expecting it. . . . It could be from the woods, it could be on the road. . . You'd better look up in the trees too because I could be up in a tree."

Danny "Rambo" Jones, a friend of the Defendant, testified that he had heard Crumley threaten to kill the Defendant "around a hundred" times, but he had never heard the Defendant threaten Crumley. Jones said that the Defendant was not a violent man. He testified that Crumley, however, had tried to kill him twice. The first time was in April 1994 before Crumley and Debbie Bryan broke up. Jones explained,

---

[1]As a result of his drug activity, the Defendant was convicted of several federal drug offenses, for which he is serving life plus five years in the federal penitentiary.

He come [sic] over at the house one day and, him and Debbie and Ricky Self, and just showed up. And I thought at the time we was [sic] friends, which I was mistaken. So I let them come on in the house then and he started saying stuff like [the Defendant] and Debbie was [sic] in the house having it on, having sex there in my house. And I told him that they wasn't [sic], you know, they wasn't [sic] even there. And Debbie was sitting there telling them that he wasn't [sic], that they wasn't [sic], and they wasn't [sic]. But he didn't want to believe that, so he just commenced on trying to choke on me and started beating me then.

The next incident occurred on Friday, July 8, 1994, two days before the death of Billy Crumley. Jones testified that Crumley came to his house, kicked the door in, and barged in the house toward Jones' wife, Tammy. Jones said that he pushed Crumley out of his house with a shotgun, but then Crumley started to take the gun away from him. Jones fired the gun, which only had one shell, in order to empty the gun so Crumley could not shoot him with it. Crumley then threw gasoline in Jones' face so that Jones could not see. At this point, Crumley took the shotgun from Jones and struck Jones with it. Jones said that Crumley "just started chopping on me like I was a piece of wood." During this time, Jones' wife was screaming hysterically, and she called the police. After Tammy Jones told Crumley she had called the police, Crumley held up the shotgun and said he "would be back to finish it off, and he planned on getting Wolf Brown [the Defendant] too." The Defendant arrived at Jones' house within fifteen minutes of Crumley leaving. Jones testified that he and the Defendant were planning to be together at Jones' house that day, and Crumley knew that. Jones thought that Crumley had gone there to kill the Defendant, but when the Defendant wasn't there, he attempted to kill Jones instead. Jones was taken to the hospital by ambulance and was treated and released.

Michael Stansberry testified that on July 8, 1994, he was at Elaina Brown's house when Crumley entered carrying a shotgun. Crumley told Stansberry that he had just left Danny Jones' house and that he had taken the gun away from Jones and beat Jones with it. Stansberry said that the barrel was bent and the stock was broken. Crumley wanted Stansberry to take him to Wal-Mart to buy some ammunition so that he could go back and kill Jones. Stansberry said that he tried to talk Crumley out of killing Jones, but when that proved unsuccessful, he accompanied Crumley to Wal-Mart and then back to Jones' house. However, when they approached Jones' house, they met two police cars. Crumley threw the shotgun out the window. Both men then jumped out of the car and ran in different directions. Crumley was arrested and taken to jail. Stansberry testified that he was friends with both the Defendant and Crumley and further testified that Crumley often threatened to kill the Defendant.

Crumley's mother, Linda Crumley, testified that her son called her from jail and told her that he had been in a fight at Danny Jones' house and had been shot. She refused to bail him out of jail, although she had done so in the past. On the evening of July 9, Crumley again called his mother and told her he was out of jail. He promised her that he was going to go to his father's house.

The Defendant testified that Crumley also called him from jail and told him that he had "better get me $1,500 down here to get out on or you'll wish you had." The Defendant said he hung up on Crumley. He said that Crumley called him again later that night on July 9 and told him that he was out of jail. The Defendant testified that Crumley said, "I'm coming to get you. . . . I'll get everybody that's there, women, children, I don't care." The Defendant spent the night at Debbie's house that night because he had his children and he did not want anything to happen around them. He said that he called his house that night and talked to Jack Presswood, who was staying there. Presswood told the Defendant that Crumley had called and accused him of lying when Presswood told Crumley that the Defendant was not there.

The next day, which was Sunday, July 10, 1994, the Defendant returned to his house with one of his young sons, Jody. Shortly after he arrived, Crumley called. The Defendant testified that Crumley said he was coming over, even though the Defendant told him not to come. Billy Webb and Jack Presswood were there. The Defendant testified that he asked Billy Webb to take his son away "in case there's any trouble," which Billy Webb did.

Billy Webb testified that he took Jody for a ride in the car, and when they returned, Webb noticed that Crumley had just pulled up. Webb said that he walked over to Crumley and told him that it would be best if he just left, but Crumley refused. Webb saw a shotgun in Crumley's car, but he did not see Crumley with a weapon when he walked toward the Defendant's house. Webb saw Crumley walk to the house, and then Webb left again with the Defendant's son.

Three witnesses testified about the death of Billy Crumley. Neil Jack Presswood, a friend of the Defendant's, testified for the State. Presswood had been staying at the Defendant's house prior to the incident, and he testified that they "were mostly using drugs and just selling drugs and partying" during that time. They were selling and using methamphetamine.

Presswood testified that the night before the shooting, Crumley called the Defendant's house wanting to purchase drugs. When Presswood told Crumley that the Defendant was not there, Crumley became very angry. Crumley told Presswood that if Presswood did not put the Defendant on the phone, "he was going to come up there and shoot everybody." Presswood did not take the threat seriously because he had heard Crumley make similar threats ten or fifteen times in the couple of months preceding this incident. The next day, Crumley called the Defendant's house again and talked to the Defendant. Presswood said that after the phone conversation, the Defendant told him that Crumley was coming over and that if Crumley came over, the Defendant was going to kill him.

Crumley did arrive at the Defendant's house, and Presswood said that he went outside to leave Crumley and the Defendant alone because Crumley was there to purchase drugs. About five minutes later, the Defendant and Crumley came outside. Presswood testified that Crumley sat on the picnic table, and the Defendant sat at the foot of the steps to the house. They were talking, but not yelling. At some point, the conversation turned to Crumley's phone call the night before, and Crumley denied making the phone call. Presswood said that he told Crumley, "Well, I know it was you, Billy. I know your voice." Crumley responded by saying, "Well, let's, you know, let's just get

these people up here that called and get this problem solved." Presswood testified that at that time, the Defendant, who was still sitting on the steps, was twirling his gun, a .357 Magnum, on his finger. When the Defendant did not respond to Crumley, Crumley said, "If you're going to kill me, all I ask is you make it quick." The Defendant then shot Crumley. Crumley was not armed, and he was sitting ten to fifteen feet away from the Defendant. Presswood said that Crumley did not act threateningly in any way before the Defendant shot.

Presswood testified that after the Defendant shot Crumley, the Defendant told him to help him pull the body around the side of the house. Presswood and the Defendant then pulled the body around the house and loaded it on the back of a four-wheeler. The Defendant took the body into the woods. When he returned, the Defendant told Presswood and Billy Webb, who had arrived at the house, that "[w]ell, you'ns [sic] know the story now. If you'ns [sic] have got anything to say about this, say it now, because I don't want it ever mentioned again." Presswood said that he only spoke with the Defendant once about the shooting after that, and the Defendant said that he felt like he had done the right thing. Presswood testified that he knew the Defendant had buried the body on the property because you could smell it.

Presswood further testified that about three weeks after the shooting, the police raided the Defendant's house. Presswood, along with several other people, was there at the time. The body of Billy Ray Crumley was found as a result of the raid. After the raid, Presswood gave three different statements to the police. At first, he denied his involvement in moving the body. He said that his third statement told the entire story. Presswood admitted writing the Defendant a letter telling him that they both knew it was self-defense and not to worry about his testimony. Presswood said that he wrote that letter because his family had been threatened, but the shooting was not in self-defense. He admitted that he had pled guilty to federal drug charges and that as part of that plea agreement he testified against the Defendant in the federal drug trial. He also admitted reaching an agreement with the State to testify against the Defendant in the murder trial. Presswood had been charged with accessory after the fact for his involvement in the shooting.

Billy Webb testified that when he returned to the Defendant's house the second time, he left the Defendant's son in the car and started walking toward the house. He looked toward the house and saw Presswood and Crumley come out of the house, followed by the Defendant. He said the Defendant "was doing some hollering, and Billy had walked over to the picnic table. And he clumb [sic] up on it and he sat down." The Defendant was standing at the entrance to the house and Presswood had walked to the side of the shed. Webb said that Crumley kept sitting on the picnic table and the Defendant kept yelling to Presswood, "Jack, you know he's calling you a liar? You hear that, Jack?" Webb said that the Defendant's voice was "[s]ort of a rage." Webb then stated, "Well, at that point in time, it didn't last but just a matter of a few minutes there before Wolf drew his pistol. He had a holster on. He drew it and he shot Billy Crumley off the picnic table." After the Defendant shot Crumley, Webb saw Presswood grab one of Crumley's legs and begin to drag him around the building. Webb said that he left at this point.

The Defendant testified that after Billy Webb left with his son, he told Presswood to take a rifle and go up in the woods, and he loaded his .357 after Presswood went outside with the rifle. He had just finished loading the gun when Crumley came in. The Defendant testified that it was just Crumley and the Defendant in the house; Presswood was in the woods with the rifle. The Defendant kept Crumley at bay with the gun. A pool table was between them. The Defendant insisted that he was afraid of Crumley because Crumley was a big man, was violent, and had repeatedly threatened to kill him. They talked in that room for thirty or forty minutes. Crumley told the Defendant that he needed money for a lawyer, and he suggested that he and the Defendant go rob some place. The Defendant said he declined the offer. Crumley got both the Defendant and himself a beer. The Defendant said he drank a beer with Crumley, but he still had the gun and would not let Crumley get close to him. He said that he repeatedly asked Crumley to leave, but Crumley would not leave. Finally, Crumley agreed to leave, and he started out the door. However, once he got outside, he sat down on the picnic table. When the Defendant again asked Crumley to leave, Crumley replied, "No, no, we've got to get this worked out. . . I've just got to get it worked out. I've got to have an attorney." They started talking about Danny Jones, and Crumley said that Jones deserved the beating he had given Jones two days before, and he would have killed Jones if he had had a bullet. The Defendant then brought up Crumley's telephone call the night before where Crumley had talked to Presswood and threatened to come up there shooting everybody. Crumley denied making the phone call and called Presswood a liar. The Defendant yelled for Presswood, who walked around from the back of the shed and leaned against the four-wheeler. Presswood then told Crumley that he knew it was Crumley who called. The Defendant testified that Crumley continued to deny calling and that he went "from mad to furious." The Defendant said,

> The second time that Jack [Presswood] told him that he, he knew it was him, that he did call, about the last and the closest to the exact same thing that Billy said, as I recall it, was, "If you're going to kill me, you'd better do it quick." And as he was saying that, he put both hands beside him and he just had started to move. He never got stood up. He just had put his hands down and had straightened up. His -- I'll say his ass had done cleared the picnic table, but he didn't have his knees straightened. I was sitting down and did right like that (indicating), shot that quick. Immediately, I jumped up and run over to him. He fell.

The Defendant testified that after shooting Crumley, he panicked. Presswood grabbed one of Crumley's legs and started dragging the body, leaving a trail of blood. The Defendant claimed that Presswood ordered him to help move the body, so he and Presswood drug the body around the house. They discussed what to do and decided to bury the body. They loaded the body onto the four-wheeler and took it into the woods, where the Defendant ultimately buried it in a hole. Before the Defendant buried the body, Presswood looked at the hole and agreed that it was the best place to bury Crumley. The Defendant said that Presswood rinsed the blood stains away. They then drove Crumley's car to another location.

# I. THIRTEENTH JUROR

The Defendant first argues that the trial court failed to properly function as the thirteenth juror in considering his motion for judgment of acquittal and a new trial. The Defendant's trial was a four day jury trial in early June 1996, with Judge Mayo L. Mashburn presiding. After the trial, the Defendant filed a motion for judgment of acquittal and a new trial, which was scheduled to be heard by Judge Mashburn on July 15, 1996. Unfortunately, Judge Mashburn passed away on July 11, 1996. Judge Carroll Ross was appointed as Judge Mashburn's successor, but he recused himself from this case due to a conflict. Subsequently, Judge R. Steven Bebb was assigned to rule on the Defendant's motion and to sentence the Defendant.

On July 9, 1999, Judge Bebb heard argument on the Defendant's motion. The defense attorney specifically requested that Judge Bebb consider the evidence as the thirteenth juror. He then began to discuss the evidence and the credibility of the witnesses, at which point he was interrupted by Judge Bebb, who said,

> Let me interrupt just a minute. One of the reasons I'm not an appellate judge is because it makes me very uncomfortable to think of being a 13th juror in a trial that I did not see based upon the record. I've read records of trials that I've tried and I find that it supplements me in making a decision having heard those witnesses myself, and so I'm going to leave that part to the Court of Criminal Appeals and the Supreme Court of the State of Tennessee.

The defense attorney then ceased arguing about the weight of the evidence. After hearing argument regarding the other issues, Judge Bebb stated,

> And I don't want to cut anybody off but let me say this: number one, I feel again at an extreme disadvantage not having heard the witnesses in the trial. I have read the record on four separate occasions to try to get ready for this hearing. In a way, well, I don't ever wish work on myself, but in a way I wish, it was an interesting transcript to read. But I feel at this time the proper thing is Mr. Brown needs to get his appeal under way and I'm going to overrule the motion for a new trial.

The Defendant asserts that these statements by the trial judge indicate that he did not properly perform his function as the thirteenth juror. We agree.

Tennessee Rule of Criminal Procedure 33(f) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Our supreme court has stated that this rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). Notwithstanding, this rule does not require an explicit statement on the record that the trial court performed its duty. Id. Compliance with the rule is presumed when

the trial court simply overrules a motion for a new trial without comment; however, "where the record contains statements by the trial judge expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or statements indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, an appellate court may reverse the trial court's judgment." Id.; see also Helton v. State, 547 S.W.2d 564, 566-67 (Tenn. 1977); State v. Dankworth, 919 S.W.2d 52, 57-58 (Tenn. Crim. App. 1995). This Court "has no independent authority to act as a thirteenth juror"; thus, the remedy for the trial judge's failure to properly function as thirteenth juror is to remand the case for a new trial. State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993); see also Dankworth, 919 S.W.2d at 59.

In State v. Moats, 906 S.W.2d 431 (Tenn. 1995), our supreme court explained the reasoning for the thirteenth juror rule as follows:

> The purpose of the thirteenth juror rule is to be a "safeguard . . . against a miscarriage of justice by the jury." State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting). Immediately after the trial, the trial court judge is in the same position as the jury to evaluate the credibility of witnesses and assess the weight of the evidence, based upon the live trial proceedings. Indeed, this Court has recognized that "the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court." Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966).

Id. at 434-35.

Given the statements made by our supreme court regarding the purpose of the thirteenth juror rule, it is difficult to see how a trial judge who has not heard the evidence and who has not seen the witnesses can act as the thirteenth juror when weight and credibility are issues. As the supreme court has asserted, appellate courts are "ill-suited . . . to assess whether the verdict is supported by the weight and credibility of the evidence." Id. at 435. When a trial judge is asked to review the weight and credibility of the evidence as the thirteenth juror based upon a written record, the trial judge "is in no better position to evaluate the weight of the evidence than an appellate court." Id. However, in some instances, a judge who has not presided over the trial may be called upon to act as the thirteenth juror. Tennessee Rule of Criminal Procedure 25(b) provides:

> If by reason of absence, death, sickness or other disability the judge before whom the defendant has been tried is unable to perform the duties to be performed by the court after a verdict of guilty, any other judge regularly sitting in or who may be assigned to the court may perform those duties. If the successor judge is satisfied that he or she cannot perform those duties because he or she did not preside at the trial or for any other reason, the successor judge may exercise the discretion to grant a new trial.

(Emphasis added). In addressing this rule, we have maintained that "a successor judge's consideration, pursuant to Rule 25(b), Tenn. R. Crim. P., of whether the duties of the original judge can be met must include an assessment of his or her ability to act as a thirteenth juror, including witness credibility." State v. Nail, 963 S.W.2d 761, 765 (Tenn. Crim. App. 1997). In assessing whether the successor judge can act as thirteenth juror, the judge

> would need to determine the extent to which witness credibility was a factor in the case and the extent to which he had sufficient knowledge or records before him in order to decide whether the credible evidence, as viewed by the judge, adequately supported the verdict. If these determinations could not be made by the successor judge, the verdict could not be approved and a new trial should have been granted.

Id. at 766 (citing State v. Bilbrey, 858 S.W.2d 911, 915 (Tenn. Crim. App. 1993)). In State v. Gillon, 15 S.W.3d 492 (Tenn. Crim. App. 1997), we stated, "Implicit in the Nail ruling is that a judge whose first exposure to the case was presiding over the motion for new trial could rule on the motion if the record was available so long as witness credibility was not an overriding issue." Id. at 502.

Although Judge Bebb overruled the Defendant's motion for a new trial, we believe that his statements on the record indicate his thoughts that witness credibility was an issue and that he could not perform his duty as thirteenth juror based on the written record of the case. Judge Bebb stated that he read the record four times to prepare for the hearing, but he maintained that he was "uncomfortable" acting as thirteenth juror because he did not preside over the trial, and he was "at an extreme disadvantage" because he did not hear the witnesses. Instead of acting as the thirteenth juror, Judge Bebb stated that he was "going to leave that part to the Court of Criminal Appeals and the Supreme Court" and that "the proper thing is Mr. Brown needs to get his appeal under way." As we have previously stated, we do not have the authority to act as the thirteenth juror. See Burlison, 686 S.W.2d at 719. Accordingly, we conclude that Judge Bebb did not properly perform his function as thirteenth juror because of his inability to do so, and we must reverse the Defendant's convictions and remand the case for a new trial.

## II. FAILURE TO RECUSE

Although our resolution of the Defendant's first issue is dispositive, we will consider his other issues as well. In his second issue, the Defendant argues that Judge Bebb erred by failing to recuse himself upon the grounds that only Judge Carroll Ross, the successor in office to the late Judge Mashburn, could rule on the Defendant's motion for a new trial. Tennessee Code Annotated section 17-1-305 provides:

> When a vacancy in the office of trial judge exists by reason of death . . . after verdict, but before the hearing of the motion for new trial, the trial judge's successor shall rule on the defendant's motion for new trial after the successor judge has reviewed the transcript and the entire record of the trial.

Tenn. Code Ann. § 17-1-305 (Supp. 1999). This statute was enacted in 1996, and it replaced the previous statue which provided that in the event of the death of the trial judge after the verdict but before the ruling on the motion for a new trial, the losing party was automatically granted a new trial. See id. § 17-1-305 (repealed 1996). The Defendant asserts that the current statute should be strictly construed to allow only the successor judge to rule on the motion for a new trial because it denies the defendant the right to have his entire case heard by the same judge. We disagree.

As previously discussed, Tennessee Rule of Criminal Procedure 25(b) allows "any other judge regularly sitting in or who may be assigned to the court" to rule on a motion for a new trial after the death of the trial judge. That rule, along with Tennessee Code Annotated section 17-1-305, allows another judge to rule on the motion for a new trial after the death of the trial judge; thus, a defendant does not have the absolute right to have his entire case heard by the same judge. We believe that Tennessee Code Annotated section 17-1-305 must be read together with other statutes, which allow a different judge to sit by interchange over a case when the regular trial judge is incompetent to hear the case. See id. §§ 17-2-101, -202. It would not be logical to limit the authority to rule on a motion for a new trial to the successor in office to the late trial judge because the successor would be in no better position to rule on the motion than any other judge who could sit by interchange. In this case, Judge Ross was the successor to Judge Mashburn and would have been the judge to hear the case pursuant to Tennessee Code Annotated section 17-1-305. However, Judge Ross recused himself because he had previously consulted with the family of the victim about the possibility of suing the Defendant. Accordingly, it was proper for Judge Bebb to hear the case by interchange. See id. We find no error.

### III. SUFFICIENCY OF THE EVIDENCE

Next, the Defendant challenges the sufficiency of the evidence. He argues that there was insufficient evidence of guilt and that there was insufficient evidence that the offense was committed prior to the return of the indictment. We will address these contentions separately.

#### A. Evidence of guilt

The Defendant argues that the State failed to prove that he acted with premeditation in the killing of Billy Crumley. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

Looking at the evidence in the light most favorable to the State, the proof established that Crumley and the Defendant had previously threatened to kill each other. On the day of the killing, the Defendant stated to Jack Presswood that if Crumley came to his house, he would kill Crumley. Knowing that Crumley might arrive, the Defendant loaded his gun. Crumley was not armed. The Defendant shot Crumley from a distance of ten to fifteen feet. According to Jack Presswood, Crumley had made no threatening movements, and the shooting "was not self-defense." From this evidence, a rational jury could have concluded that the Defendant shot Crumley "after the exercise of reflection and judgment," thereby finding that the act was premeditated. See Tenn. Code Ann. § 39-13-202(d). Therefore, we conclude that the evidence was sufficient to support the conviction for first degree murder.[2]

B. Evidence of commission of offense prior to indictment

In this issue, the Defendant presents a unique and compelling argument. He asserts that his conviction must be reversed because the State did not prove beyond a reasonable doubt that the offense was committed before the return of the indictment. After a thorough review of his argument and the applicable law, we agree.

Tennessee Code Annotated section 39-11-201 sets forth the State's burden of proof in criminal cases as follows:

(a) No person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt:
(1) The conduct, circumstances surrounding the conduct, or a result of the conduct described in the definition of the offense;
(2) The culpable mental state required;
(3) The negation of any defense to an offense defined in this title if admissible evidence is introduced supporting the defense; and
(4) The offense was committed prior to the return of the formal charge.

---

[2]The Defendant does not argue in his brief that the evidence is insufficient to support the conviction for abuse of a corpse.

(Emphasis added). Thus, it appears that our legislature has mandated that before a person can be convicted of a criminal offense, the State must prove beyond a reasonable doubt that the person committed the offense prior to the time he or she was formally charged with the offense. While it seems obvious that no person would be indicted or otherwise formally charged with the commission of the offense of murder before the victim was actually killed, the legislature has chosen to require the State to prove that fact beyond a reasonable doubt. Our research has revealed no explicit rationale for such a rule, but we believe it may have arisen from the requirements concerning the content of indictments.

Tennessee Code Annotated section 40-13-207, entitled "Time of offense," provides, "The time at which the offense was committed need not be stated in the indictment, but the offense may be alleged to have been committed on any day before the finding thereof, or generally before the finding of the indictment, unless the time is a material ingredient in the offense." Thus, unless the time of the offense is material, it does not have to be specifically stated in the indictment; an indictment is sufficient if it alleges that the offense occurred sometime prior to the return of the indictment. In State v. Shaw, 82 S.W. 480 (Tenn. 1904), our supreme court explained the rule as follows:

> The rule to be deduced from our cases is that, where there is no statute of limitations barring the offense, it is unnecessary to state the day, or even the year, but it is sufficient to aver generally that the offense was committed before the finding of the indictment; that it is not necessary to state in any case the day on which the offense was committed, unless the date itself is of the essence of the offense, as of offenses committed against laws passed for the preservation of the Sabbath, or unless the time is important to bring the offense within the operation of new or amended statutes or the like; but where there is a statute of limitations that bars the offense there should be a sufficiently definite averment of time in the indictment to show that the offense was committed within the statutory limit; and, finally, that where an impossible date is given, as in the present indictment, it will be disregarded if the offense is one as to which there is no statute of limitations, or as to which the date itself is not important.

Id. at 480 (emphasis added).

It is not clear how this rule regarding the allegation of the time of the offense in the indictment became a matter of proof at trial, but cases addressing this rule have stated,

> The rule is that the offense must be proved to have been committed prior to the finding of the indictment and within the time specified by any applicable statute of limitation; and, except where a special date is essential or time is of the essence of the offense, the time of the commission of the offense averred in the indictment is not material and proof is not confined to the time charged.

State v. West, 737 S.W.2d 790, 792 (Tenn. Crim. App. 1987); Prince v. State, 529 S.W.2d 729, 733 (Tenn. Crim. App. 1975). The Court of Appeals of Georgia, in addressing a similar rule in Georgia, has stated,

> From the earliest times, both in England and in Georgia, it has been held that unless time is an essential element of the offense charged, the time of the commission of the offense alleged in the indictment, presentment, accusation, information, or affidavit, is immaterial; and, proof of the commission of the offense at any time prior to the finding of the indictment or presentment, the filing of the accusation or information, or the swearing of the affidavit where made the foundation of the accusation, will sustain a conviction if the proof also establish the commission of the offense within the statute of limitations.

Brown v. State, 62 S.E.2d 732, 733-34 (Ga. App. 1950).

From these cases, we surmise that the rule requiring the State to prove that the offense occurred prior to the return of the indictment was a result of the rule that the exact time of the offense is not material and an indictment need only allege that the offense occurred prior to the indictment. We question, however, the necessity of making this rule a matter for the determination of the trier of fact. If the indictment alleged an impossible date, the indictment could be challenged prior to trial pursuant to Tennessee Rule of Criminal Procedure 12(b)(2). If the proof at trial established that the offense charged was not committed until after the return of the indictment, the trial court could take appropriate action at that time to dismiss the proceedings against the defendant. It appears unnecessary to ask a jury to determine whether a defendant committed an offense before he or she was charged with the commission of that offense.

Nevertheless, our legislature has required the State to prove beyond a reasonable doubt that the offense was committed prior to the return of the formal charge. Granted, this is an easy matter to prove. Generally, the first thing to happen in a trial after the jury is sworn is that the indictment is read to the jury. See Raybin, Tennessee Criminal Practice and Procedure, § 26.10. Our supreme court has stated that the reading of the indictment "is an appropriate and proper procedure. The indictment at best is a mere accusation to inform the jury of the charges against the defendant." State v. Bane, 853 S.W.2d 483, 484 (Tenn. 1993). The indictment is not to be considered evidence of a defendant's guilt, see id., but we do believe the indictment itself can establish the date upon which it was returned. Thus, the reading of the indictment to the jury, coupled with evidence of when the offense was committed, would establish that the offense was committed prior to the return of the indictment. Also, the State could merely ask an appropriate witness whether the actions of the defendant constituting the offense occurred before the defendant was charged with that offense. This would satisfy the requirements of the statute as well.

The problem with this case is that there is no evidence that the indictment was ever read to the jury or shown to the jury, and no witness was asked whether the offense occurred prior to the return of the indictment. Before the presentation of proof, the trial judge stated, "All right. Mr.

Brown, you're charged with the offense of murder of Billy Ray Crumley, and abuse of a corpse. How do you plead to those charges?" The Defendant replied, "Not guilty," and the trial commenced. At the end of the trial, the trial judge instructed the jury that the "indictment in this case charges the defendant with the crime of first degree murder . . . and the crime of abuse of a corpse." He also instructed the jury that the "indictment in this case is the formal written accusation charging the defendant with a crime" and that the "state must have proven beyond a reasonable doubt all of the elements of the crime charged, that the crime, if in fact committed, was committed by this defendant in McMinn County, Tennessee, and that it was committed before the finding and returning of the indictment in this case." Although the trial court instructed the jury regarding the indictment, there is no evidence contained in the record that he gave the jury the indictment.

We realize that it is obvious that the murder was committed prior to the return of the indictment. Nevertheless, this fact must be proven beyond a reasonable doubt. Because the indictment was not read to the jury and because the State did not otherwise offer proof of the date of the indictment or proof that the offense was committed before the return of the indictment, the State did not prove this fact at all. Accordingly, we have no choice but to reverse the Defendant's convictions due to this lack of proof.

We do, however, conclude that this lack of proof will not prevent the retrial of the Defendant. In State v. Hutcherson, 790 S.W.2d 532 (Tenn. 1990), our supreme court noted that "where the reversal is for trial error, the case may be remanded for a new trial without violating the Double Jeopardy Clause, but where an appellate court finds the prosecution's proof on the issue of guilt or innocence of defendant was insufficient to convict, Double Jeopardy commands a dismissal." Id. at 534. The court stated that "the basic distinction is whether the defect that requires reversal involved the guilt or innocence" of the defendant, and it determined that the failure to establish venue, which must also be proven before a defendant can be convicted, did not involve the guilt or innocence of the defendant. Id. at 535. We believe that establishing that the offense was committed prior to the return of the indictment is similar to establishing venue; it does not involve the guilt or innocence of the defendant. Here, the guilt of the Defendant was clearly proven. Therefore, we reverse the Defendant's convictions and remand the case for a new trial.

IV. SPECIAL JURY INSTRUCTION REQUEST

Next, the Defendant argues that the trial court erred by failing to grant his special jury instruction request. The State's primary witness against the Defendant was Neil Jack Presswood, who had been indicted for accessory after the fact in the same indictment as the Defendant and who had been convicted, along with the Defendant, of federal drug charges. Presswood admitted testifying against the Defendant in the federal drug trial as part of his plea agreement, and he admitted that he had agreed with the State to testify against the Defendant in the murder trial. As a result, the Defendant requested the following special jury instruction based in part on the pattern jury instructions for the Sixth Circuit of the United States Court of Appeals, which was denied by the trial court:

You have also heard that the government has promised certain witnesses that they may receive a recommendation of leniency which might include a substantially reduced sentence in exchange for truthful cooperation and testimony against the defendant, or that the witness will be immune from prosecution for certain crimes. It is permissible for the government to make such promises. However, you should consider the testimony of such a witness with more caution than the testimony of other witnesses. Consider whether such testimony may have been influenced by the government's promises. Do not convict the defendant based on the unsupported testimony of such a witness, standing alone, unless you believe their testimony beyond a reasonable doubt. The fact that another person has been convicted of a crime is not itself evidence that the defendant is guilty, and you cannot consider this against the defendant in any way.

You have also heard testimony from a witness who may have an addiction to drugs. An addict may have a constant need for drugs, and for money to buy drugs, and may also have a greater fear of imprisonment because the supply of drugs may be cut off. Think about these things and consider whether this testimony may have been influenced by the government's promise. Again, do not convict a defendant based on the unsupported testimony of such a witness, standing alone, unless you believe it beyond a reasonable doubt.

Instead of giving the requested instruction, the trial court gave the following standard instruction concerning the credibility of witnesses:

You are the exclusive judges of credibility of the witnesses and the weight to be given to their testimony. If there are conflicts in the testimony of the different witnesses you must reconcile them, if you can, without hastily or rashly concluding that any witness has sworn falsely, for the law presumes that all witnesses are truthful. In forming your opinion as to the credibility of a witness, you may look to the proof, if any, of (1) his or her general character, (2) the evidence, if any, of the witness' reputation for truth and veracity, (3) the intelligence and respectability of the witness, (4) his or her interest or lack of interest in the outcome of the trial, (5) his or her feelings, (6) his or her apparent fairness or bias, (7) his or her means of knowledge, (8) the reasonableness of his or her statements, (9) his or her appearance and demeanor while testifying, (10) his or her contradictory statements as to material matters, if any are shown, and all the evidence in the case tending to corroborate or to contradict him or her.

A defendant has a constitutional right to a complete and correct charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). In determining whether jury instructions are erroneous, this Court must read the entire charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. See State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998); State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). When the

-15-

instructions given by the trial judge correctly, fully, and fairly set forth the applicable law, it is not error to refuse to give a special instruction requested by a party. State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987).

The instruction regarding witness credibility given by the trial judge correctly, fully, and fairly set forth the applicable law in the State of Tennessee. The jury was informed that it should consider a witness' bias and interest in the case in addressing witness credibility, as well as any contradictory statements made by the witness. On cross-examination of Jack Presswood, the Defendant was able to bring Presswood's plea agreements to the attention of the jury, as well as Presswood's contradictory statements in the statements he gave to police and in the letter he wrote to the Defendant in jail. While the closing arguments were not included in the record, we have no doubt that the defense argued that these factors affected Presswood's credibility. Accordingly, we find no error in the trial court's refusal to give the special instruction to the jury.

## V. TESTIMONY OF JUDGE FRANK HAMMONDS

The Defendant asserts that the trial court erred by refusing to allow Judge Frank Hammonds, the Polk County General Sessions Judge, to testify concerning Billy Crumley's reputation for violence and a specific threat of violence on the part of Billy Crumley. Prior to bringing in the jury on the third day of the trial, the trial judge stated,

> I have previously ruled that I will not permit any further testimony of the alleged violence of the victim, Billy Ray Crumley, on the grounds that it is cumulative. I have further ruled that no further evidence of any specific acts of violence on the part of Crumley will be permitted, nor any further evidence of the victim's alleged threats to kill the defendant will be permitted.

In response, the Defendant made several offers of proof, one of which was the testimony of Judge Hammonds. Judge Hammonds testified that he knew the victim, Billy Crumley, and that Billy Crumley "did have a reputation of violence when he was drinking or on drugs." Judge Hammonds said that Crumley appeared before him in general sessions court a number of times. One time, Judge Hammonds saw Crumley get "real loud with the clerk over some costs," so he asked Crumley to come back into his chambers so that he could calm Crumley down. Once Crumley was back there, Crumley "flew off the handle, started to strike me I'm sure. But Officer Burris was in there and he stopped him." Although Crumley did not hit the judge, he did pull back his fist and say, "I'll knock the hell out of you." On appeal, the Defendant asserts that the trial court should have admitted this testimony because it was relevant to show a pertinent character trait of the victim, "namely his reputation for violence."

The admissibility of evidence is a matter within the sound discretion of the trial court, and this Court will not disturb the trial court's ruling absent a clear showing of an abuse of that discretion. See State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). Tennessee Rule of Evidence 403 allows a trial court to exclude evidence "if

its probative value is substantially outweighed by … considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Based on our review of the evidence, we cannot say that the trial judge abused his discretion by excluding Judge Hammond's testimony because it was cumulative. The Defendant was given ample opportunity to present evidence tending to show that the victim had a reputation for violence. Virtually every witness who testified and who knew the victim said that the victim was violent. Even the victim's mother testified that the victim had been arrested "40-some odd" times for "fighting and drinking." Several witnesses testified regarding the victim's brutal beating of Danny Jones and the victim's repeated threats to kill the Defendant. Accordingly, we find no error in the exclusion of this evidence.

## VI.  MEDICAL RECORDS OF DANNY JONES

The Defendant asserts that the trial court erred by refusing to admit Danny Jones' hospital records. The Defendant argues that the records would have shown that Jones had multiple bruises about his body, as well as a strong odor of gasoline, which would corroborate Jones' testimony regarding his beating by the victim. In refusing to admit the medical records, the trial court stated,

> I will not permit the medical records of Mr. Jones to go into evidence. He has, both he and his wife have testified concerning his affray with Mr. Crumley. No one has contested that. They have both testified as to his medical treatment, and as far as I'm concerned, all you're doing is cluttering up the record with medical records to corroborate testimony of both Jones and his wife, none of which has been contested.

As stated previously, the admissibility of evidence is a matter within the sound discretion of the trial court, and this Court will not disturb the trial court's ruling absent a clear showing of an abuse of that discretion. See Cauthern, 967 S.W.2d at 743; Banks, 564 S.W.2d at 949. We see no abuse of discretion in refusing to allow the medical records into evidence. Evidence may be excluded if its probative value is substantially outweighed by undue delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403. Here, both Danny Jones and his wife, Tammy Jones, testified regarding the victim's attack of Danny Jones. While the State attempted to attack the testimony of Mr. and Ms. Jones regarding their relationship and dealings with the Defendant, the State never attempted to refute the Jones' testimony that Danny Jones was attacked and beaten by Billy Crumley. Therefore, the admission of the medical records showing that Danny Jones was bruised and smelled of gasoline would have merely "cluttered up the record," as stated by the trial court. There was no need to present that evidence, as it was cumulative. This issue is without merit.

## VII.  FAILURE TO GRANT A MISTRIAL

Next, the Defendant asserts that the trial court erred by failing to grant a mistrial after T.J. Jordan, a witness for the State, volunteered information to the jury that a certain four-wheel land

vehicle found on the Defendant's property was "stolen." Mr. Jordan was the Tennessee Bureau of Investigation agent who coordinated the raid on the Defendant's home on July 27, 1994. During his testimony, he identified a picture of a red four-wheel land vehicle as the one which was found on the Defendant's property, and then he volunteered information that the vehicle was stolen. He testified, "And in fact, this four, four-wheeler was then determined to be stolen." The Defendant did not object and questioning continued. During the next recess, the trial judge asked the attorneys if Mr. Jordan had said the vehicle was stolen. The State confirmed that he had indeed said that, and the Defendant requested that it be stricken. After more discussion, the Defendant moved for a mistrial, which the trial court denied. The trial court then called the jury in and gave the jury the following instruction:

> Ladies and gentlemen, before you leave, let me tell you something here. If you'll recall, during the testimony of Mr. Jordan, T.J. Jordan, he identified a photograph of . . . what do they call that thing, a four-wheeler? Do you all remember his testimony? The four-wheeler, which he, he said something to the effect that it was later determined that it was stolen. Now let me tell you folks something. We have absolutely no evidence that that thing was stolen, or if it was stolen, we have absolutely no evidence that Mr. Brown stole it or knew anything about it, or knew it was stolen. So, my instruction to you is that you will totally disregard that. . . part of this testimony, and not under any circumstances hold it against this defendant in any way. Now can you all represent to me that you will follow my instruction with respect to that?

All of the jurors responded affirmatively.

The Defendant argues the trial court should have granted a mistrial because the improper statement by Mr. Jordan "poisoned" the minds of the jury "with the idea that Defendant was involved in some sort of dishonest criminal activity (i.e., theft of a four-wheel land vehicle) and no matter how strongly the trial court admonishes the witness and sustains the objection the juror's minds were irreversibly poisoned." We disagree.

The decision of whether to grant a mistrial is a matter within the discretion of the trial court, and we will not disturb the trial court's action on appeal absent an abuse of that discretion. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). Generally, a mistrial will only be declared "if there is a manifest necessity requiring such action by the trial judge." Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "If it appears that some matter has occurred which would prevent an impartial verdict from being reached, a mistrial may be declared." Id.

We find no "manifest necessity" for a mistrial in this case. While Mr. Jordan did offer improper testimony, the jury was instructed to disregard his statements. A jury is presumed to follow a trial court's instructions not to consider inadmissible evidence. Millbrooks, 819 S.W.2d at 443. Moreover, the jury heard a multitude of evidence regarding criminal activity on the part of the Defendant. Several witnesses, including the Defendant, testified that the Defendant regularly sold

-18-

methamphetamine from his home. We do not believe that testimony regarding a stolen four-wheeler would have greatly altered the jurors' opinions regarding the Defendant's character or his illegal activity. It certainly would not have "poisoned" the minds of the jurors such that the jury could not return an impartial verdict. We find no error.

## VIII. ANTI-SHUTTLING PROVISIONS

The Defendant next contends that the trial court erred by overruling his motion to dismiss the criminal charges because the State violated the anti-shuttling provisions of the Interstate Agreement on Detainers Act. The Interstate Agreement on Detainers is a compact between the states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States. See Carchman v. Nash, 473 U.S. 716, 719 (1985). Tennessee has adopted the Agreement, which is codified at Tennessee Code Annotated section 40-31-101. The Agreement is designed to "encourage the expeditious and orderly disposition of . . . charges [outstanding against a prisoner] and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." Tenn. Code Ann. § 40-31-101, art. I. The provisions of the Agreement are triggered only when a "detainer" is filed with the custodial or sending state, which includes the United States, by another state which has untried charges pending against the prisoner. United States v. Mauro, 436 U.S. 340, 343 (1978). "A detainer is a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent." Nash, 473 U.S. at 719. Once a detainer has been filed against a prisoner, the Agreement provides two methods by which the prisoner may be brought to trial in the receiving state. See Tenn. Code Ann. § 40-31-101, art. III-art. IV. Once a prisoner is brought to the receiving state, article IV(e) of the Agreement provides, "If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." Id. § 40-31-101, art. IV(e). Relying on this provision, the Defendant argues that the McMinn County Criminal Court lost jurisdiction to try him because prior to trial he was transferred back and forth between federal and state custody in violation of the Agreement, and he asserts that the McMinn County Criminal Court lost jurisdiction to sentence him because he was transferred back and forth between federal and state custody prior to sentencing. He therefore requests that the criminal proceeding against him be dismissed.

We first note that our review of the record does not reveal the filing of a detainer against the Defendant. Although the Defendant was transferred between state and federal custody on several occasions, the State obtained custody of the Defendant on each occasion through a writ of habeas corpus ad prosequendum. The United States Supreme Court has explicitly held that a writ of habeas corpus ad prosequendum, "directing the production of a . . . prisoner for trial on criminal charges, is not a detainer within the meaning of the Agreement and thus does not trigger the application of the Agreement." Mauro, 436 U.S. at 349. We have also recognized that the Agreement "is not the exclusive means of transfer of prisoners between jurisdictions" and have held that "the writ of habeas corpus ad prosequendum [is] not . . . a detainer within the meaning of the agreement and thus does

-19-

not trigger the application of the agreement." Metheny v. State, 589 S.W.2d 943, 945 (Tenn. Crim. App. 1979). Therefore, we hold that the provisions of the Agreement were never triggered because a detainer was not filed against the Defendant. Because the Agreement was never triggered, the transfer of the Defendant between federal and state custody before the final disposition of the charges against him did not violate the Agreement. See Mauro, 436 U.S. at 360-61; Metheny, 589 S.W.2d at 945.

Furthermore, even if the provisions of the Agreement had been triggered, we find that the State did not violate the provisions. The Agreement applies only to prisoners who are already serving a sentence of imprisonment in another jurisdiction. See Tenn. Code Ann. § 40-31-101 art. III(a), art. IV(a) (referring to a prisoner who "has entered upon" and who "is serving a term of imprisonment"). Although the Defendant was held in federal custody while he was awaiting trial on federal drug charges, he was not tried on those charges until December of 1995. He was sentenced to life plus sixty months, or five years, on March 4, 1996. Thus, the Agreement would not have been triggered until the Defendant had begun to serve his federal sentence after conviction. After trial and sentencing on the federal charges, the Defendant remained in federal custody until custody was transferred to the State of Tennessee pursuant to a writ of habeas corpus ad prosequendum issued on April 16, 1996. After custody was transferred pursuant to that writ, the Defendant was tried on first degree murder and abuse of a corpse charges in McMinn County between June 3, 1996 and June 6, 1996, and the trial resulted in guilty verdicts on both charges. After trial, the Defendant remained in state custody until September 1996, when he was returned to federal custody. Because the Defendant was tried on the indictments prior to being returned to federal custody, the State could not have violated the Agreement. See id. § 40-31-101, art. IV(e). Likewise, when the Defendant was again returned to state custody from federal custody in 1999 for sentencing, he had already been tried and convicted on the charges. Because he had already been tried on the indictments, the provision mandating dismissal of the charges "[i]f trial is not had on any indictment . . . prior to the prisoner's being returned to the original place of imprisonment" was inapplicable. See id.; see also Nash, 473 U.S. at 725-26; State v. Evitts, 915 S.W.2d 468, 769-70 (Tenn. Crim. App. 1995); State v. Hill, 875 S.W.2d 278, 281-82 (Tenn. Crim. App. 1993). Accordingly, we conclude that the State did not violate the anti-shuttling provisions of the Interstate Agreement on Detainers.

## IX. SENTENCING

Finally, the Defendant argues that the trial court erred by ordering his life sentence for first degree murder to run consecutively to his federal sentence of life plus five years. He asserts that it is "cruel and unusual punishment" to give him consecutive life sentences when the first sentence is a mandatory life sentence without the possibility of parole. He also argues that to do so defies logic.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing

principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a <u>de novo</u> review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. <u>State v. Thomas</u>, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988); Tenn. Code Ann. §§ 40-35-102, -103, -210.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Tennessee Rule of Criminal Procedure 32(c)(2) provides that when the defendant has "additional sentences or portions thereof to serve, as the result of conviction in other states or <u>in federal court</u>, the sentence imposed <u>shall be consecutive</u> thereto unless the court shall determine in the exercise of its discretion that good cause exists to run the sentences concurrently and explicitly so orders." (Emphasis added). A trial court may also sentence a defendant to consecutive sentences if the court determines that the defendant has a record of criminal activity which is extensive. Tenn. Code Ann. § 40-35-115(b)(2).

When sentencing the Defendant to a consecutive sentence, the trial court mentioned the positive things the Defendant had done since being incarcerated in federal prison, such as becoming a Christian and taking classes offered by the prison. The court, however, placed great emphasis on the Defendant's extensive prior criminal activity involving drugs. The court stated, "I think in the exercise of my duty . . . based on that extensive record and Rule 32 . . . that I would be derelict in my duties if I did not run this consecutive." Under our sentencing statute and Rule 32 of the Tennessee Rules of Criminal Procedure, the trial court imposed a lawful sentence. It appears that the court considered the relevant sentencing principles. Accordingly, we cannot find error in the order of consecutive sentencing.

CONCLUSION

We hold that the trial court erred by failing to properly function as the thirteenth juror and that the State failed to prove that the offense was committed prior to the return of the formal charge. Accordingly, we reverse the Defendant's convictions and remand the case for a new trial.

_____
DAVID H. WELLES, JUDGE