IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2005

## CLARENCE CARNELL GASTON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Obion County**
**No. 4-90     William B. Acree, Jr., Judge**

---

**No. W2004-01703-CCA-R3-PC  - Filed June 21, 2005**

---

The petitioner, Clarence Carnell Gaston, appeals the Obion County Circuit Court's dismissal of his petition for post-conviction relief, in which he challenged his 2001 convictions of first degree felony murder, second degree murder, and conspiracy to commit second degree murder. *See State v. Clarence Carnell Gaston*, No. W2001-02046-CCA-R3-CD (Tenn. Crim. App., Jackson, Feb. 7, 2003) (affirming the petitioner's convictions and sentences), *perm. app. denied* (Tenn. 2003). After appointing counsel, the post-conviction court conducted a hearing on May 24, 2004. Following the hearing, the court denied post-conviction relief. We affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed**.

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which Thomas T. Woodall and J. C. MCLIN, JJ., joined.

Danny H. Goodman, Jr., Tiptonville, Tennessee, for the Appellant, Clarence Carnell Gaston.

Paul G. Summers, Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This court's opinion in *Clarence Carnell Gaston* contains a summary of the facts of the petitioner's case.

> On New Year's Day 1999, the victim, Zachary Demond Achols, was shot and killed as he was standing with a group of men outside the VIP Social Club at 1212 East Main Street in Union City.

*Id.*, slip op. at 2.

As support for his contention that the evidence was insufficient to support his convictions, Gaston primarily relies on the State's failure to show his motive to commit the offenses. He points out that no proof was presented that he was present during the conversation in which his codefendants discussed "getting" Jeff Young[, an associate of the victim], or that he was aware of Young's alleged robbery of Leach. Although conceding that the State was not required to prove motive, Gaston argues that its failure to do so, combined with the poor character of many of the State's witnesses and the various conflicts in their testimony, creates sufficient reasonable doubt to overturn his convictions. The State asserts that motive is not an element of the offenses and contends that the evidence was more than sufficient to support Gaston's convictions. We agree with the State.

*Id*., slip op. at 10.

The jury heard testimony from Nicholas Hansard that Leach, Hill, and Thomas had discussed "getting" Jeff Young if they saw him at the club, presumably as retaliation for his alleged robbery of Leach. Three eyewitnesses to the shooting, Hansard, Young, and Jarvis Jones, testified that the shooting began when Gaston directed the men in his group to the group of men in which Young was standing. Although each witness recounted a different version of the words Gaston used, with Hansard testifying he said, "Get 'em," Jones testifying he said, "Red, red. There them niggers go right there," and Young testifying he said, "Yeah, that's him, that's him in the red. Shoot, shoot, shoot. Fire, fire, fire," all the witnesses agreed that it was Gaston who directed the men to Young, or to his group, and gave the command to shoot. In addition, Jones testified that he heard Gaston tell Thomas, "Yeah, you got him, you got him," as he was lying still between two cars, pretending to be dead. Hansard testified that Gaston was armed and that he told him the day after the shooting that he had chased and shot at Jeff Young. Four additional witnesses, Demecca Holder, LaFaye Johnson, Sonya Polk, and Harold Hensley, saw Gaston going out of the club before the shooting began. From this evidence, the jury could have reasonably inferred that Gaston formed an agreement with his codefendants to kill Young and that he acted on that agreement, leading his codefendants to Young and Young's companions where they stood outside the club and directing them to shoot.

Gaston argues that Young, Hansard, and Jones were not credible witnesses and that their testimony therefore should not have been

accredited. In support, he cites the criminal background of Young and Hansard, Hansard's involvement in the crime, and the failure of Young and Jones to voluntarily come forward with their stories after the shooting, as well as the various conflicts in their testimony. However, . . . [b]y finding Gaston guilty of conspiracy to commit second degree murder, first degree felony murder, and second degree murder, the jury obviously chose to accredit the testimony of these witnesses and to resolve any conflicts in the evidence in the State's favor. This was its prerogative. We, therefore, conclude that the evidence was sufficient as a matter of law to support Gaston's convictions.

*Id.*, slip op. at 11-12.

In his post-conviction evidentiary hearing, the petitioner said that he did not testify at trial, despite his desire to testify as a means of contradicting state witnesses who he claimed were untruthful. He testified that, during the two-year pendency of the case and prior to the end of the trial, his attorney never discussed with him the issue of his testifying at trial. The petitioner testified that counsel indicated that counsel did not "need" the petitioner's testimony. The petitioner testified that he was unaware of his right to testify.

He further testified that he requested counsel to pursue a speedy trial motion, but counsel declined to do so. He testified that he was arrested in February or March 1999, went into federal custody in June 1999, returned to state custody in March 2000, and went to trial in the case underlying this post-conviction proceeding in March 2001. The petitioner recalled that, although his counsel filed a motion for a speedy trial, counsel failed to aggressively pursue the motion.

Trial counsel testified at the evidentiary hearing,

It's my practice in every criminal case I have, . . . misdemeanor case or capital case, to fully inform my client of his right to testify or not to testify and the consequences of each decision. And I also make it clear that it is not my decision to make. I perceive my job as advising my client of the pros and cons of either choice and leaving that ultimate decision up to him. I don't let people testify, and I don't . . . . prevent people from testifying.

In the petitioner's case, counsel recalled that he opined to the petitioner before trial that "the thrust of his defense [could be presented to the jury] without having to risk [the petitioner's] testifying in his own behalf," thus eliminating the "devastating effect of cross-examination." Counsel testified that he made the recommendation but left the decision to testify to the petitioner. On cross-examination, counsel admitted that he did not specifically recall this conversation with the petitioner. Counsel testified, "If [the petitioner] had wanted to testify, I would have put him on the stand, even

if it was against my recommendation. . . . [T]hat's his choice, and his choice alone." He characterized his practice of following this approach as "unwavering." He testified that all the co-defendants agreed to present a "united front," and all decided to refrain from testifying. Counsel admitted that he did not subject the petitioner to a *voir dire* to illustrate the bases for his decision not to testify.

Counsel cited numerous reasons for not pursuing the motion for a speedy trial in the petitioner's case, in which the state initially filed but later withdrew a death penalty notice. First, trial counsel opined that such a speedy trial motion in a capital case is disingenuous because "every day that passes is one day that you're guaranteed the State's not going to kill your client." Second, counsel detailed the various professionals and experts that had been engaged to perform tasks such as mitigation evidence development, fact investigation, and jury consulting. He stated, "[T]hose people just need time to perform their duties." Third, counsel opined that the case developed slowly but normally for a capital case and that after the state withdrew its death penalty notice, the case "proceeded to trial in a pretty timely and orderly fashion."

In its extensive order denying post-conviction relief, the Circuit Court found that, at trial, the petitioner was not availed the procedural benefits detailed in *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), regarding his rights to testify and to decline to testify at trial, nor did the trial record indicate a knowing, voluntary, and intelligent waiver of the petitioner's right to testify. The post-conviction court recounted trial evidence that showed that three witnesses testified that the petitioner pointed out Jeff Young's group and exhorted his companions to open fire. The court further held that, due to the strength of the state's case, any error in failing to ensure the petitioner's knowing and voluntary waiver of his right to testify was harmless. The post-conviction court did not, *per se*, relate this finding to the issue of ineffective assistance of counsel.

On other issues, the post-conviction court determined that the petitioner's other allegations were meritless, as well. The court ruled that the petitioner failed to establish the claim raised in his petition that noncompliance with the Interstate Compact on Detainers, *see* Tenn. Code Ann. §§ 40-31-101 (2003), entitled him to post-conviction relief. The court determined that the detainer law did not apply to the present case because, after the petitioner's state arrest on the present charges, the federal court obtained custody of him via a writ of *habeas corpus ad prosequendum*, relying upon *United States v. Mauro*, 436 U.S. 340, 98 S. Ct. 1834 (1978) (writ of *habeas corpus ad prosequendum* issued by federal court to state authorities is not a detainer within meaning of interstate compact). The post-conviction court rejected the petitioner's speedy trial claim, noting that the petitioner was indicted in June 1999 and tried in March 2001, that he was in federal custody for eight months of the pendency of his state case, and that for a period of approximately one year, the case proceeded as a capital case. The court held that there "was no unreasonable delay in bringing the petitioner[] to trial."

On appeal, the petitioner claims that the post-conviction court erred (1) in denying his claim that a *Momon* violation requires a new trial, (2) in denying his claim that an unlawful detainer requires a new trial, and (3) in rejecting his claims of ineffective assistance of counsel that

emanated from counsel's failure to pursue the detainer, speedy trial, and *Momon* issues. Based upon our review of the post-conviction record before us and the applicable law, we affirm the judgment of the post-conviction court.

In post-conviction proceedings, the petitioner has the burden of proving by clear and convincing evidence the claims raised. Tenn. Code Ann. § 40-30-110(f) (2003). Grounds for post-conviction relief are limited to constitutional abridgements that result in a void or voidable conviction or sentence. *Id.* § 40-30-103. On appeal, the post-conviction court's findings of fact are reviewed *de novo* with a presumption of correctness that may only be overcome when the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

"A ground for post-conviction relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106(g) (2003) (providing for waiver unless a retroactively applied constitutional right that supports the claim was not recognized at the time of trial or the failure to present the claim was the result of state action).

A petitioner challenging the effective assistance of counsel has the burden of establishing (1) deficient representation and (2) prejudice resulting from that deficiency. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Deficient representation occurs when counsel's services fall below the range of competence demanded of attorneys in criminal cases. *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991). Prejudice is the reasonable likelihood that, but for deficient representation, the outcome of the proceedings would have been different. *Overton v. State*, 874 S.W.2d 6, 11 (Tenn. 1994). On review, there is a strong presumption of satisfactory representation. *Barr v. State*, 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995). If prejudice is absent, there is no need to examine allegations of deficient performance. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

In the present case, the free-standing claims of violations of the detainer law and of the principles of *Momon* are waived. Tenn. Code Ann. § 40-30-106(g) (2003). These claims were neither presented to the conviction court nor reviewed on direct appeal. *See generally Clarence Carnell Gaston.* In addition, the unlawful detainer claim is based upon the provisions of statutory law and does not, *ipso facto,* state a claim of constitutional abridgement; as such, the claim does not warrant post-conviction relief. Tenn. Code Ann. § 40-30-103 (2003).

Accordingly, we turn to the issue of the ineffective assistance of counsel. Of course, the petitioner's ineffective assistance of counsel argument includes claims that trial counsel failed to follow the principles of *Momon* and failed to pursue a violation of the Interstate Compact on Detainers, as well as that he failed to seek a speedy trial.

In *Momon*, filed on November 15, 1999, our supreme court held that "a criminal defendant's right to testify is a fundamental constitutional right guaranteed both by Article I, section

9 of the Tennessee Constitution and by the Fifth and Fourteenth Amendments to the United States Constitution. As such, the right must be personally waived by the criminal defendant." *Momon*, 18 S.W.3d at 155. Accordingly, the court determined that

> [t]o ensure that defense attorneys in future criminal cases do not unilaterally deprive criminal defendants of the fundamental right to testify, in every trial where the defendant does not testify, the trial court should allow, and indeed require, defense counsel to employ the following procedure.
>
> At any time before conclusion of the proof, defense counsel shall request a hearing, out of the presence of the jury, to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify. This hearing shall be placed on the record and shall be in the presence of the trial judge. Defense counsel is not required to engage in any particular litany, but counsel must show at a minimum that the defendant knows and understands that:
>
> (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;
>
> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;
>
> (3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Id.* at 162 (footnote omitted). The supreme court, however, concluded that a violation is subject to harmless error analysis because the "error involves the exclusion of testimony which is evidence that can be 'quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.'" *Id.* at 166 (citations omitted). "Once a constitutional error has been established, . . . the burden is upon the State to prove that the constitutional right violation is harmless beyond a reasonable doubt." *Id.* at 167. The court listed "instructive," nonexclusive factors which assist a court in determining whether an error in denying a defendant his right to testify is harmless beyond a reasonable doubt:

> (1) the importance of the defendant's testimony to the defense case;

(2) the cumulative nature of the testimony; (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; (4) the overall strength of the prosecution's case.

*Id.* The court emphasized, "[T]he goal of harmless error analysis is to identify the actual basis on which the jury rested its verdict." *Id.* (citation omitted).

The March 2001 trial in the petitioner's case was conducted after the filing of *Momon*. Nevertheless, the petitioner's counsel did not seek an exposition of the petitioner's waiver of his right to testify. *See id.* (opinion on petition to rehear) ("We hereby hold that defendants may waive the right to testify either by signing a written waiver or by engaging in the voir dire procedure set out in the initial decision of this Court."). The issue now before this court is whether trial counsel rendered ineffective assistance in failing to pursue the *Momon* regimen. We conclude that, based upon *Momon*, counsel's failure to follow the prescribed regimen equated to deficient performance; however, we hold that the petitioner failed to demonstrate by clear and convincing evidence that he was prejudiced by this oversight of counsel.

Initially, we are able to embark upon a determination of error harmlessness (and ultimately *Strickland* prejudice) because the post-conviction court adjudicated the harmlessness of the *Momon* error in response to the petitioner's *Momon* claim as freestanding error. *See Momon*, 18 S.W.3d at 168 (remanding for the post-conviction court's determination of harmless error "because the record on appeal does not contain Momon's testimony from his first trial nor does it contain an offer of proof indicating the substance of the testimony Momon would have offered at his second trial if he had not been denied the right to testify" and noting that, in the post-conviction court, Momon was attempting to establish a Sixth Amendment claim of ineffective assistance of counsel"). Moreover, in the evidentiary hearing, the petitioner testified that, had he testified at trial, he would have admitted being at the VIP club on the night of the fatal shooting, but he would have contradicted testimony that he possessed a gun and that he "chased" Jeff Young. Thus, we perceive no need for a remand to make the necessary determinations, and we proceed to analyze the *Momon* factors for evaluating harmless error and, eventually, for assessing *Strickland* prejudice.

First, the "importance of the petitioner's testimony" in advancing the defense appears to be insignificant, if not illusory. Had the petitioner testified at trial, he would not have denied being at the nightclub at the time of the shooting. Although he would have denied possessing a gun on that occasion, the testimony of multiple witnesses described his vocal role in promoting the shooting, thus establishing his criminal responsibility for the homicide even if he had fired no weapon. *See* Tenn. Code Ann. § 39-1-402 (2003) (establishing criminal liability for acts of others based upon principles of complicity). On the one hand, the petitioner's proposed testimony was probably cumulative; apparently the petitioner's fiancee testified that the petitioner remained inside the club with her all evening, and independent evidence established that everyone who came into the club that night – including the petitioner – was searched for weapons, and none was discovered. On the other hand, some of this evidence corroborated the petitioner's claims on material points. Still, the state presented cogent evidence through multiple witnesses that the petitioner was at least

complicit in the homicide, and the overall strength of the prosecution's case was significant. In the context of the evidence introduced at trial, we must conclude that the error in not protecting the petitioner's right to testify was harmless beyond a reasonable doubt.

In this situation, the harmlessness of the error results necessarily in a conclusion that the petitioner failed to prove by clear and convincing evidence that he suffered the prejudice necessary to establish ineffective assistance of counsel. *See Demetrius K. Holmes v. State*, No. E2003-02306-CCA-R3-PC, slip op. at 6 (Tenn. Crim. App., Knoxville, Oct. 7, 2004); *James Webb v. State,* No. W2003-00702-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Jackson, Feb. 9, 2004). As a result, we hold that the record fails to establish ineffective assistance of counsel in connection with the *Momon* issue.

Next, the petitioner challenges the effectiveness of his counsel based on counsel's failure to attempt to terminate proceedings when the trial court failed to conduct the trial within the 180-day period specified in the Interstate Compact on Detainers.[1]

This section of the compact or agreement[2] contains the "anti-shuttling provisions." *See State v. Brown*, 53 S.W.3d 264, 284 (Tenn. Crim. App. 2000). "The provisions of the Agreement are triggered only when a 'detainer' is filed with the custodial or sending state, which includes the United States, by another state which has untried charges pending against the prisoner."

---

[1] Embodied within Tennessee Code Annotated section 40-13-101, the compact at Article III, section (a) provides:

> Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, the person shall be brought to trial within one hundred eighty (180) days after having caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of the person's imprisonment and request for a final disposition to be made of the indictment, information or complaint; provided, that for good cause shown in open court, the prisoner or the prisoner's counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good and honor time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.

[2] Parties to the compact include the several states and the United States. *See State v. Brown*, 53 S.W.3d 264, 284 (Tenn. Crim. App. 2000).

*Id.* To be sure, the failure to comply with the 180-day provision may, in some circumstances, require the dismissal of an indictment, *see Nelms v. State*, 532 S.W.2d 923 (Tenn. 1976), but dismissal is not compelled when the 180-day limit is exceeded as a result of necessary and reasonable continuances of the trial, *see, e.g., State v. Garmon,* 972 S.W.2d 706, 710 (Tenn. Crim. App. 1998) ("Failure to comply with the one-hundred-eighty-day time limit does not automatically require a dismissal of the indictment if a continuance beyond that period is necessary or reasonable.").

In the present case, the petitioner failed to establish by clear and convincing evidence that his trial counsel deficiently performed in failing to seek a dismissal of charges based upon nonconformity with Code section 40-31-101 or that the petitioner was prejudiced from this failure. We arrive at this conclusion because the petitioner lacked a basis for relief pursuant to section 40-31-101.

Specifically, the record fails to establish that the defendant's transfer between federal custody and Obion County for trial was accomplished through Code section 40-31-101. This court has previously recognized that the compact embodied in section 40-31-101 is not the exclusive means of transferring prisoners between jurisdictions, and moreover, the terms of the compact are not triggered unless a *detainer* was filed against the prisoner. *Brown*, 53 S.W.3d at 285. The record before us in this post-conviction appeal does not reflect that a detainer was filed. Indeed, the post-conviction court found that the petitioner's transfer between Obion County and federal custody was effected via a writ of *habeas corpus ad prosequendum*. This court has said that such a writ is not "a detainer within the meaning of the agreement [on detainers] and thus does not trigger the application of the agreement." *Id.*

Thus, the record before us does not support a conclusion that the petitioner had grounds for relief pursuant to Code section 40-31-101. For this reason, we discern neither deficient performance of counsel in failing to seek dismissal on this ground nor resulting prejudice to the petitioner.

The petitioner's final appellate claim of ineffective assistance of counsel derives from trial counsel's failure to pursue a speedy trial motion. The post-conviction court determined that 21 months elapsed between the petitioner's first indictment and his trial. A second indictment charging the petitioner with the same homicide was filed approximately nine months before trial. During eight months of the 21-month pretrial period, the petitioner was in federal custody, and at some time during the pendency of the charges, the state filed a death penalty notice, which it did not withdraw until a year later. The post-conviction court determined that there was "no unreasonable delay in bringing the petitioner[] to trial, and there were sound reasons for not trying the case sooner." Additionally, the post-conviction court held that the petitioner had not been prejudiced by the delay of trial until March 2001. The record supports the findings of the post-conviction court as to the merits of a speedy trial claim and as to any resulting ineffective assistance of counsel.

The Fourth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution guarantee the right to a speedy trial in a criminal case. *See Barker v.*

*Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972); *see also* Tenn. Code Ann. § 40-14-101 (2003). Four factors are considered and weighed in determining if the right to a speedy trial has been compromised: (1) the length of the delay, (2) the reason for the delay, (3) the assertion of the right to speedy trial, and (4) any prejudice to the defendant occasioned by the delay. *Barker,* 407 U.S. at 530, 92 S. Ct. at 2192; *State v. Bishop*, 493 S.W.2d 81, 83-85 (Tenn. 1973). Of these factors, the most important is prejudice, and the critical inquiry concerning prejudice "is the impairment of the ability to prepare a defense." *State v. Vance*, 888 S.W.2d 776, 778 (Tenn. Crim. App. 1994). To activate the four-part inquiry, the interval between accusation and trial must be "presumptively prejudicial." *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686, 2690 (1992). A delay approaching one year usually activates the inquiry. *See State v. Vickers*, 985 S.W.2d 1, 7 (Tenn. Crim. App. 1997).

In our view, no speedy trial claim was tenable in the conviction court. First, the length of the delay was not excessive, especially for a capital case. Second, in the post-conviction hearing, trial counsel poignantly explained reasons for the delay from a defense perspective: A battery of experts and professionals engaged by the defense needed time to prepare for the trial. Apparently, trial counsel did file a speedy trial motion, but in the post-conviction proceeding, the petitioner failed to establish any prejudice from the failure to schedule an earlier trial. Thus, we see no merit to a speedy trial claim and no ineffective assistance of counsel resulting from the failure to more aggressively pursue the claim.

Moreover, regardless whether a more expedited trial could have been won by aggressive advocacy, trial counsel's pursuit of preparation activities such as fact investigation, mitigation evidence development, and jury selection consultation indicates a strategic approach that, despite delaying the trial, reasonably and conscientiously advanced the best interests of the defense. Certainly, we are in no position to second guess trial counsel in essentially opting to thoroughly prepare for trial.

Having discerned no grounds for disturbing the post-conviction court's judgment, we affirm the dismissal of the post-conviction petition.

 

_____
JAMES CURWOOD WITT, JR., JUDGE