# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 30, 2010 Session

## STATE OF TENNESSEE v. DAVID FREEMAN CLAY

**Appeal from the Criminal Court for Knox County**
**No. 83421    Bob R. McGee, Judge**

---

**No. E2009-00868-CCA-R3-CD - Filed September 16, 2010**

---

The Defendant, David Freeman Clay, was convicted by a Knox County Criminal Court jury of two counts of sexual battery, a Class E felony, and three counts of assault, a Class B misdemeanor.  The trial court sentenced the Defendant as a Range II, multiple offender to four years for each sexual battery conviction and six months for each assault conviction and ordered the sentences to be served consecutively for a total effective sentence of nine years and six months in the custody of the Department of Correction.  In this appeal as of right, the Defendant contends that the evidence is insufficient to support his convictions and that the trial court failed to fulfill its duties to approve the jury verdict under Rule 33 of the Tennessee Rules of Criminal Procedure.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court**
**are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined.  JOSEPH M. TIPTON, P.J., concurring in the results only.

Mart S. Cizek, Clinton, Tennessee, attorney for appellant, David Freeman Clay.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Phil Morton, Assistant District Attorney General, attorneys for appellee, State of Tennessee.

# OPINION

A Knox County Grand Jury indicted the Defendant for ten counts of aggravated rape and one count of especially aggravated kidnapping concerning the August 5, 2005 sexual assault of Debbie Rodriguez. Rocky Rogers testified that during the late morning of August 5, he was cutting hair at his Knoxville barber shop when he looked up to see "a lady walking towards the building naked." He met her at the front door to tell her she could not come inside because there were children in the shop. She told him that "she was tied up and had been kidnapped and raped." However, Mr. Rogers said that there was not a rope around the woman's neck. He told the woman to go to the store next door and that he would call the police to meet her there. He tried to give her a coat to wear, but she had already left. Mr. Rogers also stated that there was a car wash a few doors down from his barber shop.

Knoxville Police Department (KPD) Patrol Officer Keith Lyon testified that on August 5 when his shift ended he took his patrol car to a car wash where an employee brought a woman to him who claimed she had been raped. Officer Lyon said that the woman had a t-shirt and towel "to put around her." Officer Lyon said that there was not a rope around the woman's neck. He said that the woman "appeared to be very traumatized and scared to death." The woman told Officer Lyon that she had been raped at a house about two doors from the car wash. He called for an ambulance and an on-duty officer. Officer Lem Clemons arrived to complete the investigation.

The victim, Debbie Rodriguez, testified that she was living in Walter P. Taylor Homes, "the projects," on August 5, 2005. She said that she walked to a nearby convenience store at around 10:00 p.m. to buy a beer. She was wearing jeans, clogs, and a blouse and was carrying a small change purse. As she was walking to the store, she saw "a black guy" walking towards her. As their paths met, the man said hello to her, grabbed her by the neck, and pulled her with him. The victim testified that the man put something around her neck that "felt like a shoe string" and pulled her into an abandoned house. She said that she tried to run, but the man was choking her. She said he stuffed something like "a bandana" in her mouth once they got inside the house. The victim said that as she struggled, the man told her "do you want me to kill you like I killed that last bitch." The man next instructed the victim to take off her clothes and "to walk up those nine steps and if you do what I say then I might let you live." The victim said that she could not remember whether she took her clothes off or the man did because she "kept blacking out and coming to" from the choking.

The victim testified that she next remembered being "hogtied" with a rope around her neck and her hands tied behind her back and attached to her legs. She said that she was laying on a dirty mattress on the floor with a sleeping bag nearby. She described the room as filthy with pornographic magazines and Milky Way wrappers all over the floor.

The victim testified that the man then began to rape her. He penetrated her anally with his penis for about an hour. She described it as "horrible" and "very painful." She said that he talked "obscene" during each act and told her that she deserved what he was doing to her. He made the victim move into different positions and wanted her to "say obscene things to him." She said that the man had a pocket-knife and used it to penetrate her anally once. The victim said that the man "licked [her]. . . . used his penis in me, his hands, everything" both anally and vaginally. The victim said that the man forced her to perform oral sex on him also. The victim estimated that the man penetrated her "ten to twenty" times. She said that she acted like she enjoyed the rapes because when she did, the man did not hurt her so bad.

The victim testified that throughout the ordeal she "was just trying to think of how I was going to live through it. I didn't think I would live through it." The man told her not to try to escape to the next house because "he s[old] drugs for the people next door and they [would] kill [her]." She said that she finally gained his confidence so he untied her so that she could urinate. She said that he told her to urinate in a corner of the room and that each time she did, he would urinate in the same spot. The victim stated that the man eventually fell asleep. She said she was afraid to move initially, but when she realized that he really was asleep, she "got up and . . . ran." She said that the man woke up and tried to pull her back into the room to give her her clothes, but she jumped from the balcony and landed in the grass. She said that she ran "[b]arefooted and naked" to the barber shop. The man at the barber shop told her to go to the convenience store next door for help because there were kids in his shop. The victim said that she ran to the store where a man in the parking lot gave her a "big t-shirt" from his car and told her she could find a police officer at the car wash.

From the car wash, the victim went to the hospital in an ambulance. She said she was afraid that the man was following her the entire time. She described the rape kit examination as "very painful." In the courtroom, the victim identified the Defendant as the man who had assaulted her. She said that she had never met him before these offenses occurred.

On cross-examination, the victim admitted that she had consumed "a forty" before the Defendant assaulted her, but she said that she was sober throughout the incident. She acknowledged that she may have said hello to the Defendant when he approached her on the street that night. She also admitted that the arrest warrant contained no information about the Defendant putting a rope or shoe string around her neck; but, on redirect examination, she stated that there was not enough room on the warrant to include everything that happened to her that night. The victim said that Ray Cantrell was her neighbor at Walter P. Taylor Homes.

Joseph Cox, a crime lab specialist with the KPD, testified that he went to the abandoned house to recover evidence for analysis. He said that as soon as he arrived, he

found a used condom in the driveway.[1] He described the house as "extremely dirty" and "not a comfortable place to be." He found clothing near some steps – blue jeans, a bra, and an "undershirt." Mr. Cox testified that he found a mattress and sleeping bag in a back bedroom, along with pornographic magazines. He said the floor of the room was filthy. Mr. Cox also collected from the room a broken belt, Milky Way wrappers and bags, an empty vodka bottle, and "a broken glass tube that seemed like it had been used as a crack pipe."

Jennifer Robbins, a registered nurse, testified that she worked at the Sexual Assault Crisis Center at the time of the victim's assault and performed the rape kit examination on the victim. As a certified sexual assault nurse examiner, Ms. Robbins stated that she performs a "head to toe assessment" of a victim, gathers evidence, treats injuries, and offers referrals for psychological counseling or further medical treatment, when necessary.

Ms. Robbins testified that on August 5, 2005, she met the victim at Baptist Hospital. She said that the victim was "very disheveled, tearful and sobbing and crying" when she first saw her. Ms. Robbins took photographs to document the victim's injuries; the photographs show ligature marks around the victim's neck that looked as if they were made with a belt or rope, abrasions to the victim's back and shoulders, and suction-like bruises to the victim's chest. The victim's account of her attack mirrored her testimony at trial. The victim also told Ms. Robbins that her attacker forced her to masturbate him and that he ejaculated on her. Ms. Robbins determined that the victim's account was consistent with her injuries which included ligature marks on her neck and wrists, suction marks on her chest, and other abrasions and bruises. Specifically, abrasions on the victim's back correlated to the victim's claim that she had been hogtied and suffered "burns" from the carpet and mattress.

Ms. Robbins testified that the victim was "in a lot of pain" – so much that "she was unable to tolerate" the rectal examination. Ms. Robbins said that she also had to stop "mid way through" the vaginal examination due to the victim's discomfort. Ms. Robbins was able to determine through her examination that the victim suffered injuries to her vaginal area consistent with "a forceful penetration." Ms. Robbins collected saliva, ejaculate, and hair samples from the victim's body, which were sent in the rape kit for analysis.

On cross-examination, Ms. Robbins said that she did not perform any blood tests on the victim to determine drug or alcohol levels in her blood. She said she was not familiar with the effects of drugs or prescription medications on vaginal lubrication. She also conceded that the abrasions on the victim's back could have occurred by the victim's landing

---

[1] Detective Patricia Tipton testified that the condom was not tested because it was found outside in an area prevalent with prostitution and the victim never mentioned her attacker using a condom.

on the grass when jumping from a balcony. However, on redirect examination, Ms. Robbins stated that "everything [the victim] said was consistent with the findings."

Lawrence James, a forensic serologist with the Tennessee Bureau of Investigation (TBI), was stipulated as an expert in forensic DNA and serology analysis. His analysis of the rape kit evidence showed semen and saliva from the victim's vaginal swabs. Mr. James was unable to match any DNA on the vaginal swabs due to the limited nature of the samples. However, swabs taken from the victim's upper chest revealed the presence of sperm cells and the DNA testing matched the saliva sample taken from the Defendant. Swabs taken from the victim's face also revealed sperm cells that matched the DNA of the Defendant.

KPD Officer Philip Jenks testified that he arrested the Defendant on August 23, 2005, for the sexual assault of the victim. Officer Jenks said that the Defendant initially denied his identity, but when Officer Jenks produced "the wanted poster" and compared it to the Defendant, the Defendant admitted that he was "David Clay." Officer Jenks conducted a routine search of the Defendant incident to the arrest and found a white sock, a blue bandana, and a glass crack pipe. On cross-examination, Officer Jenks testified that the house where he found the Defendant was a "known drug house, a problem house in the neighborhood."

Detective Patricia Tipton with the KPD violent crimes unit testified that she interviewed the victim at Baptist Hospital. She described the victim's demeanor as "almost like a caged animal. . . . very much in the grip of fight or flight . . . . significantly traumatized. . . . [and] really quite pitiful." Six days after the assault, Detective Tipton showed the victim a photographic line-up from which she made an identification of the Defendant as the man "who had kidnapped, raped and choked her." Following the victim's identification, a warrant was issued for the Defendant's arrest.

On cross-examination, Detective Tipton acknowledged that the victim did not report in the warrant that the Defendant used a rope or shoe string during the initial confrontation. Detective Tipton said that it was not uncommon for rape victims not to "remember every minute detail" of an assault. On redirect, Detective Tipton reviewed her August 5 report concerning the victim's account of the assault; the report indicated that the victim reported the use of the shoelace during the confrontation on the street. Detective Tipton stated that the victim "always talked about shoe laces . . . and other things being used to bind her and choke her . . . . [f]rom day one."

Ray Cantrell testified on behalf of the Defendant. He testified that he knew both the Defendant and the victim. He said that sometime in August 2005, both of them were at his house and that they left together. He also acknowledged that he was serving a sentence for drug convictions at the time of the trial.

The fifty-three year old Defendant testified that he is divorced with two adult children. He said that he had a successful life as a computer programmer before he became addicted to cocaine following his divorce in 1985. His addiction led to a conviction for drug possession and sale of cocaine which caused the loss of his job at IBM.

Concerning the offenses, he testified that he and the victim went to the abandoned house to smoke crack cocaine that they had purchased from Mr. Cantrell. The Defendant indicated that he and the victim had a conversation about "what she wanted to get offered [in exchange] for some crack." The Defendant said that they agreed to go to the abandoned house. He contended that it would have been impossible for the victim to have walked through the house naked "without getting scratched or cut up." He said they went to the upstairs room where they drank vodka and smoked an "eight ball" of crack cocaine. He said that they discussed the sexual things she would do in exchange for the cocaine. He described the encounter as "almost like a business arrangement." He explained that cocaine "gives you an illusion that you can do more than you can" but that he was unable to maintain an erection due to the alcohol and cocaine. He said that the victim was "sexually aroused" and "was trying to get [him] to do things he couldn't do" – leading to the variety of sexual acts that occurred, including bondage. The Defendant said that the victim asked him to place a string around her neck and pull it while he performed oral sex on her. He testified that he was unable to penetrate her with his penis. He denied that he gagged the victim with a sock or bandana or that he "hogtied" her. He said that any sexual activity was "agreed upon . . . I paid for what I wanted, or she agreed on it."

The Defendant said that he fell asleep at around 6:00 in the morning. He awoke to a noise and discovered $340 dollars missing from his pants. He found the victim on the porch with his money in one hand and her clothes in the other. They struggled on the porch for some time before the Defendant, realizing that it would not look good to be seen struggling with a naked woman on the porch, took the victim's clothes from her and told her she would get her clothes back when she handed him his money. The Defendant decided that the victim was not going to give him his money so he went inside to finish getting dressed. He planned to confront the victim on her way out of the house, but when he returned to the porch, the victim was gone with his money. The Defendant went back to work about two blocks away. He testified that he was embarrassed by the events of the night.

The jury acquitted the Defendant of the especially aggravated kidnapping count and five counts of aggravated rape. Concerning the five remaining counts of aggravated rape, the jury convicted the Defendant of the lesser included offenses of two counts of sexual battery, a Class E felony, and three counts of assault, a Class B misdemeanor. The trial court imposed Range II sentences of four years for each sexual battery conviction and sentences

-6-

of six months for each assault conviction, to be served consecutively, for a total effective sentence of nine years and six months.

On appeal, the Defendant contends that the evidence is insufficient to support his convictions because the victim's "contradictory recollections in this case are too suspect." He also contends that the original trial judge failed to approve the verdicts as required by Rule 33 of the Tennessee Rules of Criminal Procedure, the thirteenth juror rule, and that the successor trial judge was precluded from approving the verdicts at the motion for new trial hearing. The State argues that the jury resolved all conflicts in the testimony and credibility issues by their verdict. The State concedes that it appears that the trial court did not approve the verdict properly but that the successor trial judge approved the verdict by denying the motion for new trial, the transcript of the hearing of which is notably absent from the record on appeal. Following our review, we agree with the State.

## ANALYSIS

### *Sufficiency of the Evidence*

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Essentially, the Defendant argues that the victim's allegation of non-consensual sexual contact should not be believed. However, in the light most favorable to the State, the evidence shows that the victim endured hours of non-consensual sexual contact perpetrated by the Defendant. The physical examination documented by Ms. Robbins was consistent with the victim's account of the assault. Forensic testing further revealed that sexual contact

occurred between the Defendant and the victim. The jury resolved any conflicts in the testimony or any credibility issue concerning the victim, as was their province to do, and acquitted the Defendant of five of the ten aggravated rape counts and convicted him of lesser included offenses on the remaining counts. We conclude that the evidence is sufficient to support the convictions for sexual battery and assault in this case.

*Rule 33(d) Issue*

The Defendant argues that the original trial judge failed to perform his duties as thirteenth juror in approving the jury verdict. He argues that the successor trial judge was then precluded from performing these duties because the credibility of the witnesses was a critical issue in this case. The State concedes that the original trial judge did not specifically endorse the verdict as thirteenth juror. However, the State contends, because the transcript of the motion for new trial hearing is absent from the record, we must conclude that the successor trial judge was able to perform these duties based upon its review of the transcripts from the trial. Following our review, we agree with the State.

Rule 33(d) of the Tennessee Rules of Criminal Procedure provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This rule "is the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). In State v. Carter, 896 S.W.2d 119 (Tenn. 1995), our supreme court held that the rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." Carter, 896 S.W.2d at 122. However, the rule does not require a specific statement on the record indicating the trial judge's approval of the verdict, and in the absence of a specific statement, the trial court's order denying a motion for new trial constitutes an approval of the jury's verdict. Id.

In this case the original trial judge was unable to rule upon the motion for new trial due to the election of a successor trial judge. In situations when a trial judge is unable to perform post-verdict duties due to absence, Rule 25(b) of the Tennessee Rule of Criminal Procedure provides, in pertinent part,

(b) After Verdict of Guilt. -

-8-

(1) In General. - After a verdict of guilty, any judge regularly presiding in or who is assigned to a court may complete the court's duties if the judge before whom the trial began cannot proceed because of absence . . . .

(2) Granting a New Trial. - The successor judge may grant a new trial when that judge concludes that he or she cannot perform those duties because of the failure to preside at the trial or for any other reason.

Tenn. R. Crim. P. 25(b).

This court has previously held that included in a successor judge's consideration of its ability to act as thirteenth juror under Rule 25(b) is "an assessment of his or her ability to [assess] witness credibility." State v. Nail, 963 S.W.2d 761, 765 (Tenn. Crim. App. 1997) (citing State v. Bilbrey, 858 S.W.2d 911, 914 (Tenn. Crim. App. 1993)). Thus, a successor judge must "determine the extent to which witness credibility was a factor in the case and the extent to which he had sufficient knowledge or records before him in order to decide whether the credible evidence, as viewed by the judge, adequately supported the verdict." State v. Brown, 53 S.W.3d 264, 275 (Tenn. Crim. App. 2000). If the successor judge is unable to make these determinations, the judge cannot approve the verdict, and a new trial must be granted. Id. (citing Nail, 963 S.W.2d at 766).

As noted by the State, the transcript of the motion for new trial hearing is absent from the record, rendering this court unable to determine whether the successor judge made any findings relative to his ability to rule as thirteenth juror. The appellant has a duty to prepare an adequate record on appeal. Tenn. R. App. P. 24(a). While the record fails to show the trial court's analysis, there is sufficient proof independent of observation of any witness demeanor from which the trial court could have based its approval of the verdict, to wit: the Defendant denied penetrating or ejaculating, yet the medical proof confirmed that the victim suffered injuries consistent with forcible penetration, and the Defendant's sperm was found on the victim's chest and face; and the Defendant admitted that he gave the arresting officer a false name at his arrest. Under these circumstances, we conclude that the successor judge determined that he was able to approve the verdict as was further indicated by his denial of the motion for new trial. Accordingly, the Defendant is not entitled to relief concerning this issue.

CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE