# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 26, 2013 Session

## STATE OF TENNESSEE v. PHILIP TREVOR[1] LENOIR

**Direct Appeal from the Criminal Court for Monroe County**
No. 10-006      Amy A. Reedy, Judge (Trial) and Rex Henry Ogle, Judge by
Interchange (Sentencing and New Trial Hearing)

---

**No. E2012-01257-CCA-R3-CD - Filed July 3, 2013**

---

A Monroe County jury found the Defendant, Phillip Trevor Lenoir, guilty of aggravated child neglect.  Thereafter, the trial court judge recused herself and a successor judge was appointed.  The successor judge sentenced the Defendant as a Range I offender to serve twenty-five years in the Department of Correction.  The Defendant appeals claiming: (1) the successor judge failed to engage in the proper analysis as the thirteenth juror; (2) the trial court erred when it denied the Defendant's motion for a continuance; (3) the State was statutorily required to make an election between aggravated child abuse and aggravated child neglect; (4) the evidence is insufficient to support his convictions; (5) the trial court failed to require the jury to announce the fines imposed; (6) the trial court failed to instruct the jury on "third-party culpability;" and (7) the trial court erred when it did not allow the Defendant to offer "reliable hearsay" in his defense.  After a thorough review of the record and relevant law, we conclude that because the successor judge was unable to properly approve the verdict as "thirteenth juror," a new trial must be granted.  Accordingly, the judgment of the trial court is reversed and this case is remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of Criminal Court Reversed and Case Remanded for a New Trial**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Charles G. Currier, Knoxville, Tennessee, for the appellant, Phillip Trevor Lenoir.

---

[1] The indictment names the Defendant as "Philip Trevor Lenoir."  All other documents in the record reference the Defendant as "Phillip Trevyn Lenoir."  For purposes of this opinion, we use the name appearing on the indictment.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Steven Bebb, District Attorney General; and Krista Oswalt, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the victim's severe head injury which occurred while she was under the care of the Defendant. A Monroe County grand jury indicted the Defendant for aggravated child abuse and aggravated child neglect or endangerment to a child of age six years or less.

### A. Trial

At the Defendant's trial, the parties presented the following evidence: Dr. Rick Popp, an emergency room physician at Woods Memorial Hospital, testified as an expert in the field of emergency care. Dr. Popp recalled treating the two-year old victim, J.T.,[2] on January 6, 2010. He said she was "basically unconscious" and, upon further evaluation, he determined she had some type of closed head injury requiring trauma care. Dr. Popp said that, due to the nature of her injury, he arranged transport to UT hospital in Knoxville, Tennessee for further treatment.

Dr. Popp testified that he took a history from "Mr. Philip Lenoir," although he could not identify the Defendant in court. He said that the Defendant told him that he had been riding a four-wheeler when the victim stepped out from behind a vehicle and he ran over the victim. After the victim was injured, "they just kind of waited to see" if she would improve and when she did not, the Defendant brought the victim to the hospital approximately an hour after the injury occurred. Dr. Popp said that he frequently treated injuries sustained from four-wheelers and he did not believe the injuries were consistent with being hit with a four-wheeler.

Joanie Price, an emergency room nurse at Woods Memorial Hospital, testified that on January 5, 2010, one of the intake clerks motioned for her to come over. Price approached and saw a woman holding the victim, who Price described as "lifeless." Priced asked the woman what had happened and the woman said that the victim had been run over by a four-wheeler. The man who accompanied the woman said that the accident occurred over an hour before. Price asked the man why he had waited so long to bring the victim in

---

[2] In the interest of protecting the victim's privacy, we will refer in this opinion to certain persons and witnesses by their initials.

and he explained that the victim's mother was at work while he was alone at home with additional children and was unable to bring the victim any sooner.

Price testified that the initial examination revealed that the victim was semi-conscious and her left eye was swollen. The victim had blood around her mouth. Price recalled that it was 12 degrees that day and the victim wore only a t-shirt, a diaper, and socks. Based upon the victim's dress and the temperature, Price felt "that something wasn't right" with the Defendant's story about being outside. Price noticed multiple bruising on the victim's arms, chest, and face. She said that some of the bruising appeared "older" while other bruises were "fresh bruises."

Price described the victim's mother as "unemotional" and "staring." Price said that she thought the man who accompanied the mother and victim was the child's father. She said that he kept repeating that the four-wheeler was "big." She said that the man was more emotional than the victim's mother and described him as "upset." Upon questioning, the mother said that the man had called her to come home from work and then the two had brought the victim to the hospital.

After the victim was transported to the UT Trauma Unit, the Sheriff's Department and Child Protective Services were contacted in reference to suspicions that arose during the victim's treatment. Price said that she also conveyed her suspicions to the UT Trauma Unit.

On cross-examination, Price identified paperwork the victim's mother filled out at the hospital. The paperwork listed "Philip Hensley" as the father. Price asked the man accompanying the victim and her mother if he was the victim's father and he answered, "yes."

Brenda Smith, an emergency room nurse at Woods Memorial Hospital, testified about the victim's treatment on January 6, 2010. Smith recalled that the child was brought to the emergency room by a man who said that the victim had been run over by a "very large four wheeler." She said the victim, who was "not doing very well" was taken to the trauma room and stabilized before transport to UT hospital for trauma treatment. Smith said the victim was accompanied by her mother and the mother's "live-in boyfriend," who was caring for the child at the time of the injury.

Smith described her observations of the victim as follows:

She was semi-conscious, she had multiple abrasions and bruises from about nipple line up, nothing from the waist down. We expected to have neck, back, chest and abdomen injuries if the child had been run over by a four wheeler.

There was a lot of bruising. There was no, it was kind of weird because there was no dirt, there were no leaves, there were no rocks, there was nothing that you would correlate with an outdoor injury [due to] a four wheeler, which is kind of a dirty machine. We also didn't see any cuts. Most injuries which we saw, which is just an initial assessment, w[ere] more like impact injuries rather than crush injuries. We would expect a crush injury from a four wheeler. Also the child was not dressed appropriately for the weather. You know, it was very cold. The child had on minimal clothing and we were kind of concerned, you know, if the child had been outside, hit by a four wheeler, why was she not dressed appropriate for weather, and probably not even appropriate for indoor environment during the winter. The child was not very conscious, opened her eyes once in awhile, did not respond, some response to pain.

Smith testified that she recalled that the man had been home alone with the child when the injury occurred and the mother had been at work. After the accident, the man took the child into the house and laid her on the couch. When she did not improve, they brought the victim in for treatment. He said it had been in excess of an hour since the injury. Smith described the victim's mother as "almost in denial" and having a "flat affect."

The victim's mother ("TM") testified that she had three children. She recalled that on the morning of January 6, 2012, she got ready for work, gave the victim a snack and drink, and then left for work. According to TM, the victim was in her play pen watching television. TM said that the victim had a bruise on her forehead but did not know of any other abrasions or bruises on the victim's face that morning. The other two children were at school and the victim and her boyfriend, the Defendant, were at home that day.

TM testified that she worked at her Grandfather's business in Vonore. Her hours were usually from 8:00 or 9:00 a.m. to 5:00 or 5:30 p.m. At approximately 10:30 a.m., TM received a text requesting she call home. When TM called home, the Defendant told her that he was concerned because the victim would not sit up or talk. He said he did not know whether the victim was "playing," but asked TM to come home to see if the victim was "okay."

TM testified that, when she arrived at home, she sat in her car smoking a cigarette. The Defendant opened the front door and insisted she come in to check on the victim. TM ran into the house and found the victim lying on the couch. She recalled that the victim's arms and legs were moving, but she would not open her eyes. TM and the Defendant then took the victim directly to Woods Memorial Hospital for treatment. On the way to the hospital, TM asked the Defendant what had happened and he told her that the victim walked out from behind the car and was hit by a four-wheeler. When she was hit, she fell and hit her

head.

TM testified that, at the hospital, x-rays were taken, but because of the lack of "proper equipment," a helicopter transported the victim to the University of Tennessee Medical Center for further examination. TM said that she was told that the reason for the victim's lack of response was due to a head injury. TM said that the victim "kept biting her tongue."

TM testified that she was not allowed in the room with the victim at the UTMC, so she stayed in the waiting room. At some point, she and the Defendant were taken to separate rooms where police officers spoke with each of them. She said that the victim remained in the hospital between a week and two weeks for treatment.

On cross-examination, TM testified that the Defendant was still asleep when she left the house on the morning of January 6, 2010. She confirmed that her first contact with the Defendant that day was the text message he sent her at work requesting that she call home. TM agreed that the Department of Children's Services ("DCS") has contacted her before about bruising on her children. TM explained that the victim went to visit her father, ("JT"). JT called TM and told her he was calling DCS because there was a bruise on the victim's leg. TM agreed that she had used the term "whipping" when talking with DCS employees in reference to discipline of her children. She explained that she gave her children the option between standing in the corner or receiving a "whipping." She said that she uses a belt or a switch and whips them three times. TM acknowledged that she was also charged in this case, and she had pled guilty to neglect. As part of the plea agreement, TM had to testify truthfully in the trial against the Defendant.

TM testified that she had never seen the Defendant hit the children. When he had to discipline TM's children, he would have the children stand in the corner. TM said that she never saw the Defendant display anger toward the children. She said that the Defendant had never been aggressive toward her either. TM testified that, at the time of these events, she owned two pit bull dogs.

On recross-examination, TM testified that on the drive to Knoxville to go to the hospital, the Defendant told her that "the dog" had "done something" to the victim but that the Defendant did not want "to say" out of fear "they" would kill "the dogs or something."

Dr. Marymer Perales, a Child Abuse Pediatrician, testified as an expert witness in the field of child abuse pediatrics. Dr. Perales described the victim's condition upon her arrival to UTMC as "critical." Dr. Perales said that the victim was not responsive but would cry and moan due to pain. The victim was treated with morphine for the severity of her pain. There was a laceration to her left forehead and bruising over her eyelid, her cheek, chin, and around

her ear. There was additional bruising on her chest and abdomen. Dr. Perales said that the victim also had petchia, a bruising that occurs when there is constriction such as grabbing someone's arm.

Dr. Perales testified that, after reviewing the CT scan, they found the victim had bleeding around the brain that was large enough on one side to push the brain to the other side of her skull. She opined that the bleeding in this case was caused by trauma. The CT scan also revealed a pelvic fracture and an "old healing humerus fracture" in her arm. The victim's liver enzymes were elevated indicating blunt abdominal trauma. As the victim began to recover, noted weaknesses occurred on the right side of her body.

Dr. Perales testified that she spoke with the victim's mother and learned that the victim had been hit by an all terrain vehicle and fallen backward and hit her head. Dr. Perales said that the victim's injuries were not consistent with that type of accident. Dr. Perales said that, with the extent of the victim's injuries, one would expect the impact of a motor vehicle accident. Dr. Perales said that she was told the ATV did not roll over the victim, but hit or "nicked" the victim, causing her to fall and hit her head. Dr. Perales said that a pelvic fracture requires "a significant amount of force" such as one might experience in a car accident. Dr. Perales testified that a dog was never mentioned as a source of the injuries, and the injuries were not consistent with a dog attack.

Douglas Brannon, a Monroe County Sheriff's detective, testified that, after speaking briefly with medical personnel at the hospital, he spoke with the Defendant about the victim's injuries. The Defendant said he had been at home caring for the child. At one point, he had been outside with his brother and two other children riding a four-wheeler. The Defendant related that the victim stepped out in front of the four-wheeler and he struck the victim with the four-wheeler. The Defendant told detectives that he carried the victim inside and texted the victim's mother. The Defendant described the victim as "unresponsive."

Detective Brannon said that, at that point, he viewed his interaction with the Defendant as a "conversation," not an "interrogation." The Defendant was, however, "very defensive" and said that he would not go to jail freely. Detective Brannon recalled that while he was in the room with the Defendant, a DCS worker was asking "standard DCS question[s] of a care giver" and that the Defendant was "very ugly to her." When Detective Brannon advised the Defendant of his Miranda rights, the Defendant was defensive and arrogant. He would repeatedly say, "I've heard these before," and the Defendant read the rights back to the detective as he was reading them to the Defendant.

Detective Brannon said the Defendant told him that there were two four-wheelers on the property: one on the front porch and one to the left rear side of the house. Detective

Brown said that this statement raised his suspicion because when he received the initial call on this case, he and Detective Jones went to the residence, and he noticed a four-wheeler on the porch that was inoperative. Another four-wheeler was "off to the side" and also in a "state of disrepair." Detective Brannon also noted that there were no tracks in the snow consistent with the Defendant's story that he was riding a four-wheeler around the yard. When Detective Brannon confronted the Defendant with what the detective had seen at the house, the Defendant said that, while he waited for the victim's mother to come home, he went back outside and worked on the four-wheeler.

Detective Brian Jones, a Monroe County Sheriff's Department detective, gave testimony about the interview with the Defendant that was consistent with Detective Brannon's testimony. Detective Jones said that during the interview, he stepped out of the room to contact the Defendant's brother about the incident. The Defendant's brother denied having been in Madisonville that day. Detective Jones said that he spoke with the neighbors and learned that "no four wheelers were being ridden that day on that road." He also was able to confirm that TM was at work on January 6, 2010, until she left to check on her child.

The State rested its case and the Defendant offered the following evidence: Shandra Morgan testified that she had known the Defendant for approximately fourteen years. She explained that the Defendant had dated her roommate. During this time, she watched the Defendant interact with both her roommate's children and the Defendant's nieces and nephews. She said that she never observed the Defendant abusing or neglecting the children.

Geneva Kilby testified that she had known the Defendant since 1997. She explained that she dated the Defendant for approximately seven years and had occasion to observe the Defendant interact with her own children and his nieces and nephews. She said that she never saw the Defendant hit or discipline a child. When an issue arose requiring discipline, she said the Defendant would notify the parent rather than discipline a child himself.

Kilby testified that she charged the Defendant with domestic violence in 2000. She explained that she and the Defendant were arguing when she hit the Defendant and he hit her back. She said that this made her mad so she notified the police.

Burton Keller, a friend of the Defendant, testified that he had occasion to observe the Defendant interact and care for children. He said that the Defendant was good with children and had never seen the Defendant hit a child. Keller said that he had sent his own children to stay with the Defendant for two or three days at a time.

Marlene Keller testified that she had three children. She said that the Defendant was "a friend of the family" and she often left her youngest child with the Defendant. Keller

denied ever seeing the Defendant speak harshly to a child or hit a child. She said that her children were very fond of the Defendant.

Tammy Murphy testified she had been the victim's daycare teacher. Murphy described an occasion where the victim refused to sit. She thought that the victim might be refusing to sit due to a dirty diaper. When Murphy changed the victim's diaper, she noticed bruising from the top of her back to her "lower behind cheeks." She said that the marks were perfectly straight like the victim had been hit with a child's school ruler. The director of the daycare facility instructed her to contact DCS about the bruising, and she did so.

Approximately a month later, in August 2009, T.M. brought the victim to daycare in the morning. The victim complained that her arm was hurting, so T.M. took the victim with her and left. Murphy described T.M. as "upset" and said that the victim never returned after that day.

A.M., the victim's nine-year old sister, testified the Defendant "was spending some nights" at her house. She said that the Defendant would take care of her and her siblings. She denied that the Defendant ever hit her, her brother or the victim. She said that when she got into trouble, her mother punished her. If her mother was not present and she misbehaved, the Defendant would "take away the TV." A.M. testified that she knew the victim broke her arm but did not know how the victim broke it.

I.M., the victim's seven-year old brother, testified that the Defendant would care for him during the day when his mother was not there. He denied that the Defendant ever hit or shouted at him but said that the Defendant would raise his voice "[a] little bit." I.M. said that he did not ever see the Defendant hit either of his sisters.

Tammy Walker, a Forensic Interviewer for the 10th Judicial District's Children Advocacy Center, testified that she conducted forensic interviews required for investigation of severe child abuse allegations. DCS requested an interview in this case, and Walker met with the victim on February 8, 2010. Walker recalled that the victim made no disclosures during the interview about abuse. Walker said that the victim was three and a half years old at the time and described her as "very young for her age." Walker said she believed there were delays in the victim's conversational skills. During the interview, Walker asked the victim if she had ever had a "boo-boo" or if anything scared her, but Walker was unable to understand the victim's responses.

Jessica Capps, who was dating the Defendant's cousin, testified that she was at Thanksgiving and Christmas dinners at the Defendant's father's house. The Defendant, T.M. and her children were also present. Capps said that she observed bruising on the victim's

face on both occasions. Capps also had occasion to see the victim in early January 2010. The victim was playing in Capps bedroom and Capps observed bruising on the victim's face and that her lip was swollen.

Crystal Jones, testified that the Defendant was her brother[3] and that she observed bruising on the victim at her step-father's house on Thanksgiving 2009. The week of December 18, 2009, Jones again saw the victim at her step-father's house. This time Jones noticed significant bruising to the victim's face. Jones recalled that one side of the victim's face was "black" and her lip had "dried up blood on it." After observing the victim walk across the room, Jones commented that there was something wrong with the victim's leg. She told her brother and T.M. that they needed to take the victim to the doctor. She stated that these injuries were the same injuries the victim was arrested for on January 6, 2010.

Jones testified that the Defendant had watched her child before. Whenever her child would act up the Defendant would call Jones to notify her. Jones would tell the Defendant to spank the child but the Defendant refused. Jones said that she had never seen the Defendant hit a child.

The Defendant testified that he had previous arrests and convictions. He agreed that he was convicted of: evading arrest and two counts of possession of marijuana in December 1999, vandalism under $500.00 and driving on a suspended license in April 2000, theft under $500.00 in July 2002, robbery in April 2003, and felony possession of marijuana in April 2010. The Defendant testified that he heard Kilby testify about the events surrounding his arrest for domestic assault and agreed that her account was accurate. The Defendant testified that he pled guilty in each of these cases because he was, in fact, guilty. He explained that he would not plead guilty in the instant case because he did not harm the victim.

The Defendant recounted the events leading up to the victim's injuries. The Defendant testified that on the night of January 5, he stayed out late selling marijuana. When he arrived back at TM's home at 4:30 or 5:00 a.m., he went to bed. The Defendant recalled that TM normally woke him up when she left in the mornings. That morning, however, she did not, and instead he received a phone call that woke him up after TM had left the house. The call was from someone wanting to buy marijuana, so the Defendant got up and showered and dressed. The Defendant went to the kitchen and noticed the victim in her playpen. He asked her if she wanted to eat. When the victim did not respond, the Defendant went to the

_____

[3] Jones testified at the sentencing hearing that she was the Defendant's step-sister. As we have no way of knowing the true familial relationship, we recount her trial testimony that the Defendant was her "brother."

playpen to check on the victim. He said the victim was just lying in the playpen with her eyes "rolled in her head." He picked the victim up and placed her on the couch. He began to say her name thinking the victim was "playing" like she didn't hear him. When the victim remained non-responsive, he texted TM and demanded she come home to check on the victim. Fifteen minutes later, TM arrived and they took the victim to the hospital.

The Defendant testified that when they arrived at the hospital, he dropped off TM and the victim and parked the car before going into the hospital. He denied speaking with any medical personnel and said that he only gave "the woman" medical cards and social security cards. The Defendant and TM drove to UTMC. During the drive, the Defendant learned of "the four wheeler story." He maintained that he never told anyone at Woods Memorial Hospital that he had hit the victim with a four-wheeler. He explained that TM had told medical personnel about a four-wheeler. The Defendant recalled that he and TM smoked two "blunts" on the drive to Knoxville. The Defendant said that TM instructed him to tell "them" that his brother and his brother's children were present because DCS would not "say nothing about it because there was other kids around." The Defendant agreed to tell the lie because he did not want TM's children to be "split up."

The Defendant testified that at UTMC he explained to the doctor about the four-wheeler accident after being asked. He also told police detectives the same story. He said that he realized he was lying to police but he "didn't know what else to do because it was already told." Once the detectives put together that the Defendant was lying to them, they arrested him. The Defendant testified that at this point he tried to tell the truth, but the detectives would not listen. When asked why he lied to police he said, "It wasn't me, [TM] had already told the lie and I was stuck in it."

Based upon this evidence, the jury convicted the Defendant of aggravated child neglect. Thereafter, the judge who presided over the trial recused herself and a successor judge was appointed. The successor judge sentenced the Defendant as a Range I standard offender to serve twenty-five years in the Department of Correction.

## II. Analysis

The Defendant appeals, claiming: (1) he was prejudiced by the original trial judge's failure to act as the thirteenth juror; (2) the trial court erred when it denied the Defendant's motion for a continuance; (3) the State was statutorily required to make an election between aggravated child abuse and aggravated child neglect; (4) the evidence is insufficient to support his convictions; (5) the trial court failed to require the jury to announce the fines imposed; (6) the trial court failed to instruct the jury on "third-party culpability;" and (7) the trial court erred when it did not allow the Defendant to offer "reliable hearsay" in his

defense.

As we have determined that the first issue is dispositive in this case, we address only the Defendant's contention that because the original trial judge failed to act as the thirteenth juror he is entitled to a new trial. Tennessee Rule of Criminal Procedure 33(d) imposes a mandatory duty on the trial judge to serve as the thirteenth juror in every criminal case. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). Rule 33(d) does not require the trial judge to make an explicit statement on the record. Instead, when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id*. Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror, may an appellate court reverse the trial court's judgment. *Id*. Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court concludes that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn.1995).

The original trial judge did not expressly approve the jury verdict as thirteenth juror in this case. *See State v. Carter*, 896 S.W.2d 119, 122 (Tenn.1995) (holding that Rule 33 of the Tennessee Rules of Criminal Procedure imposes a mandatory duty upon a trial judge to serve as the thirteenth juror in every criminal case). In situations where the original trial judge is unable to perform post-verdict duties, Tennessee Rule of Criminal Procedure 25(b) provides:

> (b) After Verdict of Guilt. -
>
> > (1) In General. - After a verdict of guilty, any judge regularly presiding in or who is assigned to a court may complete the court's duties if the judge before whom the trial began cannot proceed because of absence.
> >
> > . . . .
> >
> > (2) Granting a New Trial. - The successor judge may grant a new trial when that judge concludes that he or she cannot perform those duties because of the failure to preside at the trial or for any other reason.

Therefore, as required by Rule 25(b)(2) of the Tennessee Rules of Criminal Procedure, the successor judge must consider whether it can perform the thirteenth-juror review. *See State v. Brown*, 53 S.W.3d 264, 275 (Tenn. Crim. App. 2000). A successor judge, assessing

whether he or she is able to act as thirteenth juror, must "determine the extent to which witness credibility was a factor in the case and the extent to which he had sufficient knowledge or records before him in order to decide whether the credible evidence, as viewed by the judge, adequately supported the verdict." *Brown*, 53 S.W.3d at 275. "When witness credibility is the primary issue raised in the motion for new trial, the successor judge may not approve the judgment and must grant a new trial." *State v. Biggs*, 218 S.W.3d 643, 654 (Tenn. Crim. App. 2006) (citing *Brown*, 53 S.W.3d at 275).

In the present case, the original trial judge did not approve the jury's verdict after it was announced. Before sentencing, the original trial judge recused herself and the successor judge was appointed. The successor judge presided over both the sentencing hearing and the hearing on the motion for new trial. In his motion for new trial, the Defendant asserted that he was entitled to a new trial because the original trial judge failed to act as the thirteenth juror. During argument on the motion, the following exchange occurred between the Defendant's attorney ("Counsel") and the successor judge:

> Counsel: I believe that that brings into play the whole question of the thirteenth juror rule, and there I have scoured the transcript, as I'm sure the Court has, and there was no finding by Her Honor as thirteenth juror. The problem caused by the fact that she recused herself may be proffered as the reason for that, but also perhaps . . . the - other than my motion for a judgment notwithstanding the verdict is - that's there. The factual questions that we have brought in did not therefore get Her Honor's passage on that, and I respectfully note that Your Honor, of course, was not at the trial.
>
> Court: Correct.
>
> Counsel: And I don't think that you can be the thirteenth juror.
>
> Court: *As it relates to some issues, I think you're right* on, on, on that, on, on some of them, on some issues.

(Emphasis added). After further discussion on other issues, the successor judge overruled the Defendant's motion and, specific to the issue of the thirteenth juror rule, made the following finding:

> The Court notes again, having read the transcript, that there is *more than enough evidence, which if believed by the jury who, who determines credibility*

*of the witnesses*, that would sustain his conviction. The part about who did what is totally circumstantial. There, there's - you know, your client was the one that made the call. There was no direct testimony of anybody who saw the, the injuries inflicted; no question about that. But, but circumstantially, *if the jury believed certain witnesses, which they obviously did, there was more than sufficient evidence* from which they could have found him guilty.

(Emphasis added).

The State correctly notes that the successor judge did not specifically state the extent to which witness credibility was a factor in the case or use the terminology "overriding issue." However, in our view, his statements clearly indicate his belief that witness credibility was an overriding issue that prevented him from acting as thirteenth juror. The successor judge clearly identifies the credibility of the witnesses as a key issue in determining whether there was sufficient evidence for the jury to convict. He further concedes that there are some issues upon which he can not rule because he was not present during the trial. Based on these statements, the successor judge effectively concluded that witness credibility was an overriding issue at trial, thus precluding the successor judge from determining whether the evidence supported the verdict. Therefore, the successor judge erred when it denied the Defendant's for a new trial. As such, the Defendant is entitled to a new trial in this matter.

### III. Conclusion

Based on the foregoing, we remand this case for further proceedings consistent with this opinion.

_____
ROBERT W. WEDEMEYER, JUDGE